ROBERT J. RAU vs. CATHERINE B. VON ZEDLITZ & others.

Suffolk. Nov. 16, 1880; Nov. 17, 1881. — Jan. 5, 1882. ALLEN, J., absent.

Upon an appeal in equity from a decree of a single justice on a question of fact, the evidence being reported, the full court will not reverse the decree, unless it clearly appears to be erroneous.

If a woman on the eve of her marriage is induced by threats of the imprisonment of her intended husband, and by undue influence and fear that her marriage will otherwise be prevented, to sign an agreement to pay the debts of her intended husband, the agreement cannot be enforced in equity; and a part payment by her, after signing the agreement, on legal proceedings being threatened and in ignorance of her rights, is not in equity a ratification of the agreement.

If a woman, induced by undue influence, signs an agreement to pay a debt of her intended husband, the fact that the creditor forbore to sue the original debt and to arrest the debtor and that the woman thereby obtained a husband and a title, will not prevent the woman from setting up the defence of undue influence when the creditor seeks to enforce the contract in equity.

Where a contract is sought to be enforced in equity, the defence that the defendant was induced to sign it by undue influence may be set up by answer.

Where a single creditor under the Gen. Sts. c. 113, § 2, cl. 11, seeks the aid of a court of equity to prove his debt and to obtain equitable relief out of a trust fund, the equitable defence of undue influence and threats may be set up, and the defendant is not obliged to show duress at law in order to avoid his liability.

ENDICOTT, J. This is a bill in equity, under the Gen. Sts. c. 113, § 2, cl. 11, brought against the Baron and Baroness Von Zedlitz and the trustee under her marriage settlement. The plaintiff alleges therein that the Baroness is indebted to him upon two drafts, accepted by her at Dresden, in Saxony, on the day previous to her marriage, which are now due and unpaid, and he seeks to obtain a decree, that the trustee of the marriage settlement shall apply to the payment of the drafts so much of the trust fund as is necessary.

The defence is, that the acceptance of the drafts was forced upon the Baroness by threats and undue influence, and is therefore invalid, and cannot be enforced in a court of equity; and that, under the provisions of the marriage settlement, the fund cannot be applied to the payment of these drafts.

As the case is presented to us, no question arises upon the second branch of the defence. The presiding judge heard the case on the evidence, and dismissed the bill, on the ground that

the acceptance of the drafts was obtained by threats and undue influence; from his decision the plaintiff appeals, and the evidence upon which the finding is based is reported.

Upon a careful examination of the evidence, we cannot say that the decision upon the question of undue influence is erroneous. The record is voluminous, but the principal and material facts are as follows: The Baroness Von Zedlitz, whose maiden name was Kelsey, and who was a native of this Commonwealth, was married on April 12, 1877. While travelling in Europe she became engaged, in December 1876, to the Baron Von Zedlitz. She possessed considerable property in her own right, and a marriage settlement was prepared here at her request, and sent to Dresden the following April. It was executed by her and her intended husband on April 10, two days before her marriage. The Baron Von Zedlitz was at that time largely indebted to the plaintiff, and there was evidence that some of the money was advanced to the Baron upon the promise by him to repay the plaintiff on his marriage with Miss Kelsey, whom he represented to be possessed of a large fortune. On April 9, the plaintiff went to Dresden for the purpose of obtaining from Miss Kelsey payment of his debt. Being informed of the marriage settlement, he endeavored without success to persuade the Baron to prevent its execution. On the following day, which was April 11, Miss Kelsey was induced to go to the office of a notary public, to make some arrangement about a sum of money, which the Baron's mother, Mrs. Von Winning, informed her the Baron owed to the plaintiff. She went, accompanied by the Baron and his mother, about five o'clock in the afternoon, and found there the notary, the plaintiff, another creditor of the Baron by the name of Müller, and Mr. Von Winning. An interpreter was also present during the interview, which continued till eight o'clock. And the evidence reported relates chiefly to what then took place.

She was told that the Baron was indebted to the plaintiff in the sum of 15,000 marks, and she was requested to sign the drafts to that amount, copies of which are annexed to the bill. It appears in the evidence that she refused, saying that it was impossible; that she had no money, and that she had parted with all her property. She was solicited again and again to sign the drafts, and was told by Mrs. Von Winning that, if she did not,

disagreeable consequences would follow; that, unless the drafts were signed, the marriage on the following day would not take place; that the police would prevent their leaving their dwelling, or would stop them at the door of the church; and that the whole affair would be published in the newspapers. It also appears from the testimony of the plaintiff, that he intended to have the Baron arrested unless Miss Kelsey paid the debt. She desired to leave the room, and was told that she could not go until the matter was arranged. Upon the suggestion being made that Mr. Lehman, a lawyer who had been employed in connection with the settlement, might be sent for, it was opposed by the plaintiff.

The plaintiff could not speak English, and Miss Kelsey could not speak German, and Mrs. Von Winning, who spoke English, appears to have been the medium of communication between them, and was passing from one to the other during the interview. There was evidence that a portion of the money lent by the plaintiff to the Baron had been received by her, and it is evident that she was very desirous that Miss Kelsey should sign the drafts; and the presiding judge might well find, upon the evidence reported, that she was acting in behalf of the plaintiff, or in collusion with him, in persuading Miss Kelsey to sign, before the magistrate, the acceptances and other documents, among them a protocol, so called.

During this time Miss Kelsey was very much excited, and at the last of it was in tears, and there was evidence that she fainted. She stated in her testimony, "I think for a moment or two I must have lost consciousness, for the first thing I knew the Baron was holding me at an open window, and somebody gave me a glass of water;" and again, "I was so worn out and tired and overcome, that just as soon as I recovered consciousness, which I lost, Mrs. Von Winning came up to me and said, 'Now you had better sign,' and I thought at that time that I would do almost anything she asked me, and so I consented." She then signed the acknowledgment of the indebtedness of the Baron, and the agreement that she would assume and pay it, and also signed the drafts. This was near eight o'clock. While in the room she paid some money to Rau and also to Müller, and there was a violent altercation between the Baron and Müller,

during which the Baron seized Müller and shook him. It also appears that Miss Kelsey was of a nervous and excitable temperament, and not familiar with business or the care of property.

There was conflicting evidence in regard to what took place before the notary. But we are of opinion that the presiding judge, before whom the case was heard, and who saw the principal witnesses, namely, the plaintiff and the Baron and Baroness, might well find that the acceptance of the drafts was forced upon Miss Kelsey by threats and undue influence. The contract she entered into was without consideration, and it was purely a question of fact whether she was induced to sign it by threats and undue persuasions, and through fear that her marriage would be prevented. This in equity will constitute a good defence to the bill. Upon an appeal from a decree of a single justice, on a question of fact, the evidence being reported, the full court will not reverse the decision, unless it appears clearly to be erroneous. *Reed* v. *Reed*, 114 Mass. 372. *Montgomery* v. *Pickering*, 116 Mass. 227. See also *Singer Manuf. Co.* v. *Loog*, 18 Ch. D. 395, 427.

A young woman, upon the eve of her marriage and in a strange country, requested and urged to assume and pay the debts of her intended husband, being led to believe, if she does not comply with the solicitations pressed upon her, that her marriage may be prevented, her intended husband arrested, and the whole affair published in the newspapers, certainly is the object of undue and improper influence ; and in yielding to it at last, after long resistance, and without independent advice, cannot be said to be acting as a free and voluntary agent, for the circumstances preclude the exercise of free and deliberate judgment. The contract which she assumed was utterly without consideration ; and it was said by Lord Westbury, in *Williams* v. *Bayley*, L. R. 1 H. L. 200, 218: " A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of

either refusing, and leaving his son in that perilous condition, or of taking on himself the amount of that civil obligation." In that case the threat was to prosecute the son for forgery.

The case of *Kempson* v. *Ashbee*, L. R. 10 Ch. 15, resembles the case at bar. The plaintiff, a young lady, living with her step-father, at his solicitation, soon after she was of age, became surety on his bond to pay a debt, payable to the defendant at the end of six years. The defendant on the maturity of the bond brought an action and recovered judgment against the step-father, and the plaintiff, who still lived with her step-father, was induced by him to execute a second bond, as surety to pay the judgment and costs. Both bonds were prepared by the step-father's solicitor, and without independent advice. The defendant brought an action against the plaintiff on the bonds. On a bill brought by her, both bonds were set aside as against her, and it was held that the second bond was connected with the first, and that, as there was no proof that she was aware of the invalidity of the first bond, the second was no confirmation. *Dent* v. *Bennett*, 4 M. & C. 269. *Lyon* v. *Home*, L. R. 6 Eq. 655. *Eadie* v. *Slimmon*, 26 N. Y. 9. *Baldwin* v. *Parker*, 99 Mass. 79. *Central Bank* v. *Copeland*, 18 Md. 305.

The plaintiff contends that by her subsequent acts she confirmed the transaction. While living in Germany after her marriage, the plaintiff pressed for payment and threatened legal proceedings, and she paid to him money on account of the drafts, and wrote letters to her trustee requesting him to send her money for that purpose. But to constitute a confirmation, the acts must have been done with that intention by one who was not under the influence of the previous transaction; *Montgomery* v. *Pickering*, 116 Mass. 227, and cases cited; and with a knowledge of its invalidity. *Kempson* v. *Ashbee, ubi supra*. She was ignorant of her rights at that time, and supposed she was compelled to pay by reason of the obligations she had entered into.

It is also contended by the plaintiff, that his forbearance to sue is a sufficient consideration for her acceptance of the drafts. But this principle of law has no application here. His forbearance to sue cannot prevent her from avoiding the

contract on the ground that he exercised fraud or undue influence in obtaining it. If it were so, a party fraudulently or unduly persuaded to be responsible for the debt of another could never, after ascertaining his rights, rescind the contract, if the party guilty of the fraud or undue influence forbore to sue the principal. A party thus guilty cannot make an illegal contract binding by any act or conduct of his. If he had forborne to sue, or anything had intervened to his injury, after the party defrauded had ascertained the fraud, a different case would be presented. But of this there is no evidence in this case.

In this connection the plaintiff further contends that his forbearance to sue is not all; that "Miss Kelsey herself received direct and lasting benefits, a husband and a title, considerations to be enjoyed forever, and which to her were beyond the possibility of any pecuniary measurement." In support of this position, the language of Mr. Justice Wilde, in *Walker* v. *Sherman*, 11 Met. 170, 172, is quoted, that "The slightest damage to the plaintiff, or benefit to the defendant, is a sufficient consideration to support his promise." But the concluding portion of the sentence, namely, "there being no fraud practised upon him in obtaining his acceptance of the order," would seem to cover the case at bar. The inference from the plaintiff's argument is, that he would have prevented the marriage unless she had signed the acceptance, or, as stated by the counsel for the defendants, "the argument for the plaintiff is, in effect, that she cannot rescind because she is married, and the plaintiff can no longer prevent her marriage." It is sufficient to say, that the fact of her marriage cannot furnish a legal consideration for her acceptance of the drafts, if she was fraudulently or unduly influenced to accept the same.

We have no doubt that, where a contract is sought to be enforced in equity, undue influence may be set up by answer as a defence, though a cross bill would be necessary if the defendant seeks relief by the delivery up or the cancellation of the contract. It was therefore open to the defendant to set up the undue-influence by answer, and, so far as this case is concerned, it was not necessary to file a cross bill, as she does not seek the delivery or the cancellation of the drafts.

*Andrews* v. *Gilman*, 122 Mass. 471. *Richards* v. *Todd*, 127 Mass. 167. 2 Dan. Ch. Pract. (4th ed.) 1550.

It is conceded that, in the absence of any evidence of the law of Saxony, the question of duress or undue influence is to be determined by the law of this Commonwealth. But it is argued that, although this is a bill in equity, yet the rule at law is to be followed in determining the validity of the debt, and the question is whether there was duress at law, and not whether there was undue influence according to the rule in equity; although the liability of the trust fund to satisfy such debt is to be determined as in equity. The plaintiff says he was forced into equity because the property has been placed in trust, and therefore the defendant cannot rely on an equitable defence. But the plaintiff was not forced into equity to prove his debt; he could have established his debt at law, and then have sought in equity to charge the trust fund with its payment. Having come into a court of equity voluntarily, with his whole case, asking to be allowed to prove his debt and thereby obtain equitable relief, the defences in equity to his demand are open to the defendant. Whenever a plaintiff seeks to enforce a contract in equity, an equitable defence may be set up, though the remedy may not be so complete as by cross bill seeking to set the contract aside. If the plaintiff had sued the drafts, an injunction might have issued in equity to restrain the further prosecution of his suit, and equitable relief could have been obtained, and the drafts set aside so far as the female defendant is concerned, as in *Kempson* v. *Ashbee*, *ubi supra*.

Nor do the rules applicable to creditors' bills govern this case. Under such a bill strictly so called, an injunction may issue against all other creditors from suing at law or prosecuting suits, except under the direction of the court where the bill is pending. Creditors being thus forced into a court of equity, it is said that the legal rights of every creditor, and the validity of his debt, must be determined in equity upon the same principles as it would be at law. 1 Story Eq. Jur. § 549. In *Whitaker* v. *Wright*, 2 Hare, 310, it was remarked by Vice Chancellor Wigram: "But nothing would be more unjust than that the court should restrain the creditor from proceeding to

enforce his rights at law, except upon the principle of allowing him to bring his legal rights with him into the office of the court, which it substitutes for the proceedings at law." Whether in such a case this defence of threats and undue influence could be set up, we need not inquire. This is not a creditors' bill brought in behalf of all the creditors. It may be brought by a single creditor, and the other creditors cannot be compelled to come in, and have no right to come in and share with the plaintiff the benefit obtained by the suit. It is in the nature of an equitable trustee process, as distinguished from a creditors' bill. *Phœnix Ins. Co.* v. *Abbott,* 127 Mass. 558. *Chapman* v. *Banker & Tradesman Publishing Co.* 128 Mass. 478.

*Decree affirmed, with costs.*

This case was argued in November 1880, and reargued in November 1881, by *A. D. Chandler,* for the plaintiff, and by *N. Morse & J. L. Thorndike,* for the defendants.