Statement of the Case.
NICHOLLS, J.
Petitioiiers seek to recover from the defendant $800, with interest at the rate of 6 per cent, from June 23, 1900, based on 16 promissory notes, of which the defendant was a joint and several maker.
Defendant, for answer to plaintiffs’ petition, averred:
That he was not indebted to plaintiffs in any sum whatever; that there was no good, valid, and legal consideration for the notes executed by respondent, but that the same were obtained upon representations of said Yowell & Williams that á person in whom this defendant felt an interest and for whom he had affection had committed the crime of forgery; that said Yowell & Williams represented that, if this defendant would execute the said notes, they would deliver the alleged and pretended forged paper to this respondent, or to the party who was charged with having committed said offense against the laws of the state of Arkansas; and that said person should not be prosecuted therefor.
That thereupon, and upon the representations and assurances held out by said Yowell & Williams to compound a felony so alleged to have been committed, and there being no other consideration for the said notes, respondent, out of consideration for the person charged, and from a feeling of consideration, executed the notes upon which this action is. brought.
That thereafter the said Yowell & Williams, notwithstanding the fact that they had promised and obligated themselves to deliver the said pretended forged notes into the possession of respondent, or of the party alleged to have committed said forgery, and in order to coerce the payment of other moneys alleged to be due them, and to relieve themselves from the contract hereinafter recited, procured an indictment against the party alleged to have committed the forgery as aforesaid, and subjected said party so charged to. have committed the crime of forgery to the expense of a defense of said unwarranted prosecution, and of which the said party so. charged was, after due trial in the courts of the state of Arkansas, honorably acquitted.
That at the time of executing the notes as. aforesaid, and for the purposes aforesaid, it was further stipulated and agreed that the-commissions earned upon insurance renewals on policies effected by the person who was. charged with having committed the forgery aforesaid should be applied first to the payment of his individual obligations due the-said Yowell & Williams, and any excess of commissions, after the retirement of the individual obligations aforesaid, should be applied to the joint note of Alexander Walker- and respondent, respondent only being called upon to make good and pay any deficiency after the application of the commissions on, renewals as hereinbefore recited.
That from time to time before the obtention of the indictment hereinbefore referred to, and the trial of the case, the contract as herein recited was so construed and interpreted by said Yowell & Williams, and that, they did, from the excess commissions earned, by said Alexander Walker on renewal of insurance policies assured by him while in the-employ of said Yowell & Williams, apply *31 .said excess to the payment of the joint and several notes executed by respondent and Alexander Walker.
That, after making the application as aforesaid on more than one occasion, they subsequently repudiated their said obligation to so apply the excess of commissions to the obligations held by said Yowell & Williams and executed by respondent and Alexander Walker.
That prior to the institution of the present proceeding the said Yowell & Williams instituted proceedings in this court to recover from respondent the sum of $450, with interest ; that said proceeding was instituted pending the trial of the indictment procured by said Yowell & Williams; and that the suit against respondent as aforesaid was upon a part of the same series of obligations upon which this suit was based, and executed for the same purpose and consideration.
That respondent was restrained, by the same consideration which prompted him to sign the notes as aforesaid, from interposing any defense to said action, fearing that the said Yowell & Williams would, taking advantage of their position, press and prosecute the said Alexander Walker upon the indictment so obtained by them upon the alleged and pretended forged documents, the surrender of which was the consideration of these notes; that respondent was coerced under cover of judicial process to pay to said Yowell •& AVilliams the sum of $560.30, which amount was paid under the circumstances herein-before recited; and that respondent was entitled to recover from said Yowell & Williams the amount so paid by him, they having violated their obligation to surrender to said Alexander Walker, or respondent, the pretended and alleged forged orders, which, after due trial, were shown to have been .simply memoranda for the guidance of said Yowell .& Williams in their business, and of which fact the said Yowell & AVilliams had full knowledge at the time, although using the same for the purpose of coercing the payment by said Alexander Walker of the amount alleged to have been withheld by him, and for which he executed the notes for the surrender of the paper alleged and pretended to have been forged as aforesaid.
That at the time of the execution of the notes herein sued on, and those paid by him under duress as hereinbefore recited, there were also executed some 12 additional notes, each representing the sum of $50, the exact number of which said notes, however, this respondent cannot positively state, for he retained no memorandum of the same, respondent executing the said notes with a view of quieting the threatened prosecution on the alleged charge of forgery, and which notes so given were prompted by the same consideration of affection for the party against Whom said charge was leveled, with the view and purpose of suppressing a criminal prosecution arising out of said alleged forgeries.
That said notes lastly described were still in the possession of said Yowell & Williams; that there was no good, valid, and legal consideration therefor; and that respondent was entitled to possession of said notes and the return thereof by said Yowell & Williams, in order that said notes may be canceled and annulled, and not be outstanding against this respondent.
In view of the premises defendant prayed that plaintiffs’ suit might be dismissed, at their costs; and now, assuming the character of plaintiff in reeonvention (said Yowell & Williams being nonresidents), respondent prayed that, after due and legal proceedings had, respondent have and recover judgment against said Yowell & Williams for the sum of $560.30, being the amount paid by him to said Yowell "& Williams upon the notes hereinbefore described, and which was paid under coercion and duress; that said Yowell & Williams be further adjudged, decreed, and ordered to deliver up to respondent, for cancellation and annulment, all the notes held by *33 them against this respondent; and respondent finally prayed for all costs and for general relief.
We gather from the record that the Union Central Life Insurance Company, of Ohio, of which John M. Patterson was president and Allen Waters the general superintendent or manager, had as its state agents in Arkansas the plaintiffs, Yowell & Williams. The latter had in their employ by contract Alexander Walker as agent at Pt. Smith, Ark. He was the brother of the defendant and the brother-in-law of Milton P. Boyd, of Pt. Smith, Ark. In order to secure Yowell & Williams for the faithful execution of his duties, Alexander Walker executed in their favor a bond for $1,000, signed by Dr. Bailey and Dr. Eberle as securities. In January, 1900, Alexander Walker defaulted for $1,000 or for $1,500. The plaintiffs forgave him and allowed him to continue as their agent. On January 19, 1900, the plaintiffs wrote the following letter to Allen Waters:
“We have a disclosure of a most serious and startling nature; that is, our agent, Mr. Alex. Walker, has been collecting a large amount of his renewals in cash and has been reporting them by note. We got onto this a few days ago, and our Mr. Williams went up to see him and confronted him with it, and he broke down and confessed to all. He has our sympathy, from the fact that he has a wife and several girl children, and is himself as poor as can be. This is no excuse, though, for his wrongdoing. * * * This shortage is going to be anywhere from $2,000 to $4,300, and we will ask you to come down at once and assist us in protecting ourselves, as it is going to be almost impossible for us to save anything out of it until we can get you here. If you come, we think he will then believe that the company will take it up. He has no friends or relatives in Pt. Smith who could give him any material assistance, but he has a brother in New Orleans who is well fixed, and we believe that this brother would come to his assistance before he would see him sent to the penitentiary. We inclose you a list of matters that Mr. Walker has furnished us with and confesses that these dotes are forged.”
On June 16, 1900, Williams wrote a letter to Waters in which he said:
“Both of my attorneys advised me that we not say anything to either Dr. Bailey or Dr. Eberle until we could hear further from Norman Walker; for, unless Norman Walker will come to his assistance, there is no chance to realize anything. * * * The proposition is now that Mr. Boyd will pay $25 a month in settlement of his portion of the bond, and that Alex. Walker will divide up the balance into notes of $100 a month, and Norman Walker will join him in the notes, and that Alex.’s renewal interest shall be credited on the notes each month, and Norman Walker will pay the balance. If we can do this, there is a possible chance that we may be able to save something out of the wreck; but, if Mr. Norman Walker still declines to do this, I am going to put him in the penitentiary. I never in all my life saw such total indifference as is displayed by both him and his relatives. They all seem tickled to death that none of them will sustain any loss.”
On May 14th Yowell & Williams wrote to the defendant, Norman Walker, as follows:
“We regret extremely to have to lay before you the condition of your brother Mr. A. Walker’s business with ourselves. About five years ago we made a contract with him to solicit insurance for us, and gave him nearly every cent there was in it, and unfortunately for him, and for ourselves too, we forwarded him all the matters in which he was interested. It seems that from time to time, when he was hard up, he would use funds belonging to the company, and in order to conceal this he has forged a large number of notes. We never suspected such a thing until last January, and then our suspicions were aroused, and upon careful investigation we found what he was doing and went up to see him in regard to it, and he confessed all. We suppose there were about 20 or 25 of these forgeries, and his shortage amounts, on these matters, to about $2,500. We have not mentioned this to any one, and he still acts as our agent, and it is our great desire to avoid any publicity or injury to either him or his family; but we must have this money at once, as the company have declined to charge it to our account, and we haven’t the money to pay to them. We believe that if you can come here immediately we can arrange this matter by which no one will sustain any loss. The contract with Alex, now gives him a 5 per cent, renewal interest so long as he is in our employ, and this now amounts, we should think, to about $600 or about $700 a year. What we want to do is to have Alex, immediately raise the amount of his shortage, and we can then make a new contract and continue his renewal interest, by permitting him to give a new bond and allow us to handle the collections. In that way there would be no temptation to him, and he could permit his renewal interest to go to paying the parties who had advanced the necessary amounts to make good his shortages. We have refrained mentioning this to you from the fact that ever since January Alex, has been promising us to be able to make a very nice *35 payment in a few days; bnt be has postponed it and postponed it until the company has now demanded an immediate settlement. We have a bond from him for $1,000, and unless something is done immediately we will proceed against his bondsmen. We sincerely trust that you can come here, and we feel sure that, if you can assist him in raising this money, we can arrange the matter while here, where you will sustain no loss, and it will enable Alex, to pull through and save his good name and that of his family. We will appreciate if you will wire us immediately upon receipt of this letter as to what you will do. Our instructions from the company are imperative, and, unless there is a prospect of settlement from you, we will immediately have to proceed against the bond. We assure you that in this matter we have done everything in our power to protect Alex, and assist him in every way.”
On May 17th Milton Boyd wrote to Norman Walker:
“Mr. Williams informs me that he wrote you fully in regard to the matter a few days ago. * * * Mr. Williams is inclined to help Alex, all he can, and has agreed to arrange the matter with the company, provided payment of $1,500 on account is made at once. He insists upon this being done, as his instructions from the company are imperative. The matter is a very serious one, as explained to you in Yowell & Williams’ letter. I have seen the papers, and it could not be worse. * * * Alex, has no resources that I know of, and I am unable to help him financially. His only chance therefore, to save himself and avoid publicity and prosecution, is the assistance you can offer him, which I hope you will not hesitate to give.”
On May 19th Yowell & Williams wrote as follows to Norman Walker:
“We had a long talk with both Alex, and Boyd, and we believe that, if you can assist him in this matter, you will not lose a cent, as his renewals can go towards paying it back, and his renewal interest now, we think, will amount to between $600 and $700 per annum, and should increase each year. * * * Please let us urge upon you the vital importance of something being done immediately. We have the kindest feelings for Alex., and are doing all in our power to shield and protect; but we know positively that, if we are forced to proceed against his bondsmen, they will not be charitably disposed towards him. One of them (Dr. Bailey) is very bitter on account of Alex, being forced to testify in a suit against him, and, if the matter is broached to him, it will immediately result in a prosecution, and, as previously written you, while we regret to say it, Alex, has certainly laid himself criminally liable.”
Yowell & Williams wrote to Allen Waters on May 19, 1900, as follows:
“I wrote to Alexander Walker's brother, giving him a full statement of Alex.’s condition, and asked him to wire me immediately what he would do. I had a long talk with Alex, and his brother-in-law, Mr. Boyd, and I do not believe there is any chance to effect a settlement, only through Mr. Norman Walker. * * * X enclose you a copy of a letter which I have just written him (Norman Walker). I find that, if we proceed against Alex.’s bondsmen, they will certainly put him in the penitentiary, and I also believe that we can collect the bond only by suit, and I am very anxious indeed to avoid the suit if possible.”
Yowell & Williams wrote Norman Walker a letter on June 20, 1900:
“We do not think that you or any member of the family can say that we have been harsh, or have not given sufficient time for the arrangement of this, from the fact that this shortage was discovered January 18th, and we have been working as hard as men could to try and get it amicably arranged. * * * We' merely wish to say now that our Mr. Williams leaves here to-morrow night for Et. Smith, with the intention of closing this matter definitely. If we are to consider this lost, we desire to know immediately, and bring suit against the bondsmen; and, if we can make anything out of it, it will be that much saved from the wreck. * * * We think, in justice to you, we would notify you of the action we intend to take; for we assure you that the matter will be closed Saturday one way or the other.”
On March 10, 1900, the plaintiffs wrote to John M. Pattison, president:
“As written you, Mr. Walker’s shortage is going to amount to about $4,000, and it is going to take exceedingly fine work to save ourselves, and we must insist that you let Mr. Waters come here and assist us in this matter.”
On March 21st Allen Waters wrote to the plaintiffs:
“I do not see how I can be of any assistance to you in this Walker matter, because I do not see that we, as a company, can take any action, and you yourselves could make it just as interesting for Mr. Walker as the company might be able to do.”
On May 7, 1900, Allen Waters wrote to Yowell & Williams:
“I think it important for you to keep a tight line on Mr. Walker just at this time, because, unless you do, you will certainly sustain a loss in the end.”
On June 11th Allen Waters wrote to plaintiffs:
*37 “I think we cannot look for any help here [from Norman Walker], and that you should put the matter in the hands of Judge House at once. They will know, then, that you are in earnest and will do something. It is probably advisable to terminate Alex.’s contract at the same time, but Judge House will advise you as to that. I think it important, because to continue him will be to hurt your case.”
On June 14,1900, Yowell & Williams wrote to Allen Waters:
“We went to see Judge House, and it is impossible for him to leave for a number of days. * * * We have deemed it best to take Gen. Kinsworthy up to-night, instead of Judge House. Nal talked it over with Judge House, and he advised that Kinsworthy would be a good man for the place. We have always feared that Alex, had not told his brother the truth. He is one of the biggest liars we have ever been thrown up against. We have lost all sympathy for him, and we do not care how serious his punishment shall be.”
On June 29, 1900, plaintiffs wrote to Norman Walker:
“Your favor to hand, and it gives us much pleasure to know that you will sign the notes with Alex, as agreed upon; for this now will settle the whole matter, and we believe that Alex, will go to work at once, and that your assistance will enable him to make a man of himself. * * * The notes, as stated in the account, are in our possession and have been shown to Mr. Boyd, and also to Alex. * * * After examining these reports, we will thank you to return same to us. We will refer you now to the February report in order to show you how this shortage grew so large before we discovered it. * * * We trust that you have already signed the notes and returned them to Mr. Boyd; for, as soon as we get the settlement, the new contract will be entered into and everything will go off in good shape.”
On December 12, 1900, they wrote to him:
“Ere this you have no doubt heard that we have had Alex, arrested for forgery, and we now wish to explain our position in this matter.”
On December 12, 1900, plaintiffs wrote a letter to defendant, in which, after reciting the adjustment which had been made of Alexander Walker’s shortage in June, 1900, and an arrangement which had been made by which his brother-in-law, Boyd, was to be the agent of the company, and he was to remain in his office, they referred to a later misconduct on his part and a resulting shortage by him, in consequence of which they had laid the whole matter before the district attorney, and an indictment for forgery was found against him. Referring to this matter they said:
“When Mr. Boyd confronted Mr. Walker with oúr statement, he confessed to what he had been doing. He had collected and used $925.76. Our Mr. Williams went to Ft. Smith to try to arrange a settlement, and, in a conference with Mr. Boyd, he (Mr. Boyd) refused to pay it or become responsible for it. * * * As soon as Mr. Walker found that Mr. Williams was in town, he left the city and no one knew where he had gone. Our Mr. Williams supposed he had skipped, and as we had been so badly imposed upon, and Mr. Boyd had declined to make this amount good, Mr. Williams swore out a warrant against Mr. Walker, charging him with forgery. After this was done Mr. Walker the next day returned to Ft. Smith and had a conference with his friends, and they have arranged to make up the shortage, provided tire criminal prosecution be stopped. Our Mr. Williams has done all in his power to have the matter stopped, but cannot say yet what will be done. We think this explanation is due you, from the fact we do not wish you to think that we had resurrected the old matter and proceeded against him on account of your failure to pay your notes promptly at maturity. We think that, although Alex, is your brother, you cannot feel but what we have been extremely lenient with him. * * * We will appreciate if you will write us stating some definite period at which you can meet your notes.”
On the 16th of February, 1903, Boyd, referring to defendant’s answer in the present case, wrote to Williams as follows:
“In replying to your letter of the 10th instant, would say that I am surprised to hear that Norman Walker, in his answer to your suits, says that you had agreed that, in case he would sign the notes, you would not prosecute Alex., and that you would surrender all evidence of an incriminating nature that you had.
“I am satisfied that he has been prompted to say this, and believes it be true, from statements made in letters to him from Alex, and myself, in which we may have stated to him that the only chance to avoid prosecution was to settle the claim of your firm as soon as possible.
“We all know that you were friendly to Alex., and that you had been very lenient and patient with him, and that we were sure, by settling your claim, you would not prosecute.
“Norman Walker had nothing to do with the negotiations for settlement with you, except to sign the notes for one-half the amount of Alex.’s indebtedness in the first claim. He was *39 not present at any time, and has no Way of knowing what transpired during- the negotiations, except through Alex, and myself. As stated above, we may have told him that you would not prosecute if settlement was made, and that it was imperative that it should be done at once; but, so far as you arc concerned, you made no promises. On the contrary, you have always stated, not once, but on several occasions, that your attorney here had advised you to avoid doing' so, as it would make you liable and guilty of compounding a felony.
“I cannot understand Norman Walker’s object in trying to avoid jiayment of the notes he signed. I have always regarded him as an honorable man, and he bears that reputation in New Orleans, where he has lived all his life. It certainly cannot be from anything Alex, has said to him, for, in a letter I recently received • from Alex., he tells me to say to you that he will do anything you wish him to do ; that he cannot pay anything yet, but that the money is due you, and must and will be paid.
“Am sorry you are having so much trouble about the matter and sincerely hope you will be able to get it satisfactorily settled.
“Yours very truly,
“Milton P. Boyd.”
Norraan Walker gave the following testimony:
“Q. Do you mean that any express agreement was ever made by the plaintiffs, or either of them, with you, that this paper, the old forgery papers, would be surrendered to you upon the execution of your notes to the plaintiff?
“A. No, sir; I never expected it to be returned to me, but to Milton Boyd or Alexander AValker.
“Q. The expectation that it would be returned to Alex. Walker or Milton Boyd was not based upon anything that the plaintiffs, or either of them, said or wrote to you?
“A. Not directly — through Milton Boyd or Alexander Walker. I didn’t carry on that part of the negotiation, but simply the note part of it.
“Q. Then, so far as you know of your own knowledge, no such promise was ever made?
“A. As far as I 'know, no such promise was made.
“Q. And you don’t know of your own personal knowledge of their making such promise to any one else ?
“A. Not personally.”
Boyd, in testifying, said:
“It was understood, of course, that, by making the settlement which they agreed to accept, it would close the matter, and it was tacitly understood, of course; that no prosecution would be made, as Mr. Williams said all they wanted was to get their money. I cannot say they agreed to surrender all evidence of the crime; but Alex. Walker and myself understood, of course, that by settlement of the indebtedness they would be perfectly satisfied, and no prosecution would follow. * * * Subseguently Alexander Walker was indicted for forgery upon two or three notes held by Yowell & Williams, which were alleged to be forgeries. * * * I was acting on behalf of Alexander Walker in making the settlement. The settlement effected between Alex. Walker and Yowell & Williams and Alexander Walker’s indebtedness to the firm, and it was represented in part by some forged paper which was held by Yowell & Williams. It was understood that the settlement was absolutely necessary in order to save Alexander Walker from being prosecuted. I never represented Norman AValker, and did not represent him at the time the adjustment between Alexander Walker and Yowell & Williams was made. I knew that Norman AValker was to sign notes jointly with Alex. Walker for one-half of Alex. Walker’s indebtedness to Yowell & Williams. The settlement of Alex. Walker’s indebtedness to Yowell & Williams was made to cover his total indebtedness to them, and it was understood that no prosecution would follow. Both Alex. Walker and myself, who effected the settlement, understood at the time, if he could secure Norman Walker’s signature to notes for one half of Alex Walker’s indebtedness, Alex Walker’s personal note for the otlior half would be accepted by Yowell & Williams in full settlement of the indebtedness.
“The bond, being for only $1,000, did not cut much figure in the settlement; but Mr. Williams gave us to understand that unless the settlement was effected, he would be compelled to call upon the bondsmen, and in order to avoid this I may have urged Norman Walker to sign notes for one-half of the indebtedness, as per agreement with Mr. Williams.
“Judge Kinsworthy, who represented plaintiff in the settlement, said he knew that he had made no threats whatever to Alex. Walker or any one else relative to a criminal prosecution, and I know that Mr. Williams did not in my presence, and I know, furthermore, that I cautioned the firm of Yowell & AVilliams that they could not afford to make any kind of threats or promises relative to a criminal prosecution in the matter.”
Mr. Williams, one of the plaintiffs, testified as to what took place after Alex. Walker confessed:
“Well, we sent for Mr. Boyd (a brother-in-law of his and one of his bondsmen), and told him that we wanted a settlement of the account, and he said there was no chance of doing any thing at that time, but that Alex. AValker had a brother, Mr. Norman Walker, in New Orleans, who' was wealthy, or, rather, who had a splendid income, and that he felt sure that, if we gave them time and did not proceed against the bond, he could get Mr. Norman Walker to assist in the settlement of the shortage. The matter was continued for several days pending the settlement; I making propositions, *41 ancl Mr. Boyd making counter propositions and telling me that he was consulting with Mr. Norman Walker. I also wrote Mr. Norman Walker, giving him a full statement of the case, and telling him that, if no settlement could be reached, we would be compelled to bring suit against the bondsmen; but at no time or at no place and to no one did I or a member of my firm even threaten a criminal prosecution, nor did I make any promises not to prosecute, nor to surrender one of the papers or evidence that I had of these embezzlements and forgeries. He denied that he had ever agreed to surrender any forged paper, or agreed that Alex. Walker should not be prosecuted,”
Tlia district judge, in rendering judgment against the defendant, assigned the following reasons:
“I find that the point involved herein has been before our Supreme Court in the following cases, viz.: Ozanne v. Haber, 30 La. Ann. 1384; Field v. Rogers, 26 La. Ann. 574; Morgan v. Knox, 15 La. Ann. 176; Beckley v. Clark, 8 La. Ann. 8; and Butterfly v. Blanchard, 1 Rob. 340.
“From these authorities I conclude that the law in this state is that, where both a criminal and civil liability grow out of the same offense, the .parties concerned may satisfy or even compromise the private injury, provided that in so doing they do not include in their transaction the public wrong.
“Nor is it of any consequence that one party acts in the hope and expectation that the prosecution will not be pushed, or that the other intends, after obtaining satisfaction, to proceed no farther.
“It would seem, therefore, that, where such expectations or intentions have not been communicated by the one to the other — in other words, where there is no express • agreement (written or verbal) to stifle the prosecution— the transaction will be held as valid; aliter, where there is. But, if no express agreement can be shown, no implied one will be inferred.”
On appeal the Court of Appeal used the following language:
“The reconventional demand having been abandoned in this court we need not consider it at all. At the outset it may be stated that that there is no dispute that Alex. Walker was a defaulter and forger, and that plaintiffs were victimized by him to the amount of $4,200.”
After making this statement, it proceeded to examine the first defense, to wit, “that the notes were given under duress, as his brother was threatened with a prosecution for forgery,” and reached the conclusion that the notes were so given, but that, defendant having acquiesced and ratified the contract by payment of the first notes after the threats after the prosecution had been made, he was estopped from setting up the first defense. Merrick’s Rev. Civ., Code, art. 1855. The correctness of that conclusion is not questioned in this court.
It then proceeded to say:
“We are of the opinion that the second defense — that the consideration was an illegal one, because against public morals and policy — is fully sustained by the evidence, and in consequence defendant cannot be held liable on the notes given in settlement of his brother’s criminal liability. Counsel for plaintiff urges strongly that unless the defendant, upon whom the burden of proof admittedly is, can show the existence of an express and positive agreement to stifle a criminal prosecution, the contract is valid. The evidence found in this record may not be an express agreement in the sense intended by counsel; but it is of such a cnaracter as to point conclusively to what was in the minds of the persons to the agreement at the time it was consummated. Certainly, in the case at bar, the parties plaintiff and their advisers were shrewd, as shown by the correspondence, to enter into an open and precise agreement looking to the settlement of their claim against defendant’s brother which should stipulate in so many words ‘that, provided restitution was made, there should follow no criminal prosecution.’
“The correspondence following Norman Walker’s determination to help out his erring brother establishes beyond the peradventure of a doubt, in our opinion, that the settlement made by defendant was intended to close the matter up, and so understood by both plaintiff and defendant.
“On June 20, 1900,' plaintiffs wrote defendant:
“ ‘Your favor to hand, and it gives us much pleasure to know that you will sign the notes with Alex, as agreed upon; for this, now, will settle the whole matter.’
“When we consider the long correspondence between the parties, and the frequent mention of impending prosecution if the matter is not settled, it is not unreasonable to assume that plaintiff’s expression, ‘this, now, will settle the whole matter,’ meant that there should not be a public prosecution. In the light of the circumstances brought out in this case, it strikes us that any other assumption would be absurd.
“Now let us see what was defendant’s understanding of the agreement. When on the witness stand he is asked:
“ ‘Q. Mr. Walker, what consideration did you receive from Yowell & Williams for the notes which you jointly executed with Alex. Walker, some of which are sued on in this case, and those not sued upon you claim in your reconventional demand should be returned to you?
“ ‘A. There was no financial consideration at all, except in so far as preventing a public prosecution.
*43 “ ‘Q. Prosecution of what?
“ ‘A. Alex. Walker.
‘“Q. For what?
“ ‘A. For forgery.
“ ‘Q. Was that the only consideration running from you to Yowell & Williams?
“ ‘A. Yes, sir; the only one. I never heard of the man before.
“ ‘Q. Had they any claim upon you of any character whatever ?
“ ‘A. I never heard of or saw them before.
“ ‘Q. Why did you give those notes, Mr. Walker?
“ ‘A. I thought to prevent a prosecution for forgery.’
“From the tenor of the letters written by plaintiffs and Milton Boyd, who reported the former’s plan to Norman Walker, the latter had reason in the first place to fear a criminal prosecution of his brother, and having, from fear of such a result, signed the notes, lie was perfectly justified in assuming the consideration to be a promise not to prosecute; plaintiff having written him (June 29, 1900), ‘This, now, will settle the whole matter.’
“We repeat that, though there is no express agreement to stifle a prosecution, yet there is abundant proof in the record to sustain the opinion that this was intended by the parties, and defendant cannot be held liable under the agreement entered into with, and the notes made in favor of, plaintiffs.
“ ‘An obligation without a cause or with false or unlawful cause can have no effect.’ Merrick’s Rev. Civ. Code, art. 1893.
“ ‘The cause is unlawful when it is forbidden by law, when it is contra bonos mores or to public order.’ Merrick’s Rev. Oiv. Code, art. 1895.
“ ‘That is considered as morally impossible which is forbidden by law or contrary to morals. All contracts having such an object are void.’ Merrick’s Rev. Civ. Code, art. 2031, § 2; Morgan v. Knox, 15 La. Ann. 176; Field v. Rogers, 26 La. Ann. 576.
“The fact that the forged documents or evidences of guilt of Alex. Walker were not given into the hands of defendant, or destroyed, does ’not alter the case; and that a criminal prosecution was instituted on one of the forged papers covered by the agreement only serves, in our opinion, to show bad faith on the part of the plaintiffs.
“It would make the opinion unnecessarily long to take up all the minute matters brought out upon the trial of the cause below, which would in no wise assist in otherwise determining the issues involved.
“In support of the view which we have adopted relative to the nature of the agreement necessary for the compounding of a felony, defendant cites Greenhood on Public Policy, p. 453, as follows:
“ ‘Agreements in Terms to Compound Unnecessary. It is not necessary to prove that there was in terms an agreement to compound the crime. If it is apparent that such was the intention of the parties, and the agreement was such as to carry out such intent, it is enough. It is not necessary that the person receiving the consideration should agree not to commence new proceedings against the person accuséd to render the contract invalid. It is enough that it is understood that the accused is to derive some immunity from criminal responsibility or some advantage in that regard by the contract being made. So a note given by one arrested for obtaining money by false pretenses, with the understanding that he should be released if it was given, so that he might go to work to earn money to pay it, though it be delivered to a middleman only with such understanding, and no proof to be offered that the condition was assented to by the prosecution upon its delivery to him.’
“Again this learned writer says:
“ ‘Express promise need not be proved. Neither is it necessary that there should be' an express promise to stifle the prosecution. What the law condemns is the disposition of public matters by private arrangement. It forbids public justice to be made the subject of private bargains. If, therefore, the party making concessions is induced to believe that the prosecution will not be begun, or will be stopped, either by the promisee or some one whom the promisee knew was holding out such inducements, the promise is void.’
“Again he says:
“ ‘Immaterial When Agreement to Compound Made. It is not necessary that the promise to forbear should have been made at the very moment, or even the same day, as the execution of the agreement to pay. It is enough if it appears that such promise was made at that time, or prior thereto, and that all parties acted in view of that promise, or that it was the inducement which operated upon the minds of the obligors.’ ”
Opinion.
The plaintiffs sue defendant upon obligations absolute in character and free from taint on their face.
The defense is made that the consideration for which the defendant executed the same was illegal. It is not denied that Alexander Walker, for whom the defendant signed the notes as security, owed plaintiffs the amount of the same. It is shown that by reason of the execution of these notes two persons were released who to a certain extent were liable to plaintiffs as sureties for Alexander Walker’s performance of his duty as an employe.
Under such circumstances the burden is upon the defendant to establish the defense by *45 clear proof. Morgan v. Maddox, 8 Mart. (N. S.) 295; School District v. Alderson, 6 Dak. 145, 41 N. W. 466; Swann v. Swann (C. C.) 21 Fed. 291; Barrett v. Weber, 125 N. Y. 18, 25 N. E. 1068; Richmond v. Dubuque, etc., 26 Iowa, 202; Kellogg v. Larkin, 3 Pin. (Wis.) 123, 56 Am. Dec. 164.
The defendant has not adduced in this instance the evidence required.
We do not find that the plaintiffs, in order to obtain defendant’s signature to the notes, threatened to prosecute his brother criminally, nor that they promised, in consideration of his signing them, not to prosecute him, to suppress evidence in support of his criminality, or to turn it over to the defendant or any one else.
The only part taken by the plaintiffs in this matter was to write a letter to the defendant informing him of the fact that his brother was heavily indebted to them, had used their funds, and in order to conceal that fact had foz’ged a large number of notes, which he had turned over to them; that he had confessed the fact; that they had not mentioned this to any one, and it was their great desire to avoid any publicity or injury, either to him or his family; that the insurance company for which they were state agents insisted upon holding them responsible for the shortage, and they did not have the money to pay them; that they had a bond for $1,000 to cover this defalcation; that unless something was done immediately they would proceed against the bondsmen; that they sincerely trusted that he could assist his brother in raising this money, and they believed, if he did so, they could arrange the matter so that he himself would suffer no loss, and would enable his brother to pull through and save his good name and that of his family; that their principals were pressing them, and unless there was a prospect of the settlement from him they would have to proceed immediately against the bond; that in this matter they had done everything in their power to protect his brother and assist him in every way.
Plaintiffs wrote a second letter to the defendant, in which they said;
“We have the kindest feelings for Alex., and are doing all in our power to shield and protect him, but know positively that, if we are forced to proceed against the bondsmen, they will not be charitably disposed towards him. One of them. Dr. Bailey, is very bitter on account of Alex.’s being forced to testify in a suit against him; and, if the matter is broached to him, it will immediately result in a prosecution, and, as previously written you, while we regret to say it, Alex, has certainly laid himself criminally liable.”
In neither of these letters is there any threat on the part of the plaintiffs to prosecute criminally defendant’s brother, or any intimation that, if defendant would assist him, they would zzot do so. They certainly had the right to sue the bondsmen, and a declaration, made by them to defendant, that, in consequence of their own principal pressing payment from them and having no money to meet the shortage, they would be forced to sue the bondsmen, was simply the announcement to him of their intention to pursue their undoubted legal right in the premises, which was in law no threat. Merrick’s Rev. Civ. Code, art. 1856.
The statement made that, if they did sue the bondsmen, they were satisfied the latter would have recourse to a prosecution, was a mere conclusion on their part as to what the bondsmen would do, and their own regret that such a result should follow falls far short of any engagement on their own part not to prosecute Alexander Walker. If there was any implied promise arising out of the situation, it was an implied promise not to sue the bondsmen.
Defendant calls the attention of the court to N. O. Gaslight Co. v. Paulding, 12 Rob. 378; Schultz v. Catlin (Wis.) 47 N. W. 946; Williams v. Bailey, 1 English & Irish Appeals, p. 218; Town of Sharon v. Gager, 46 *47 Conn. 194; Adams v. National Bank, 116 N. X. 606, 23 N. E. 7, 6 L. R. A. 491, 15 Am. St. Rep. 447; Bryant v. Peck & Whipple Co. (Mass.) 28 N. E. 679; Rau v. Von Zedlitz, 132 Mass. 164.
Plaintiffs cite Couder v. Oteri, 34 La. Ann. 697; note to the English case of Williams v. Bailey, 1 Eng. & Irish Appeals Cases, 218, in the sixth volume of English Ruling Cases; Merrick’s Rev. Civ. Code, art. 1853; Green-hood on Public Policy, p. 458, rule 388, and the authorities cited therein — the rule being stated as follows:
“A promise which merely secures private satisfaction to one for a wrong clone him is not void by reason of the mere fact that a prosecution for such offense has been begun or is contemplated by him, although the promisee is induced by such promise to forbear from further proceedings.”
The “illustrations” given, under the rule being:
“(1) A. having arrested B. for swindling him in a boat not owned by him, B. gave A. a note, with surety, for the price paid. They are bound.
“(2) A., who had forged B.’s acceptances, 9!-fered the holder new paper if he would give him the old paper, nothing was said about the prosecution for forgery. The new paper is valid. Expectation that prosecution shall terminate does not invalidate. The fact that the promise was made with the expectation that the prosecution would be dropped, ©ven though a warrant be exhibited by the promisee at the time of giving the promise, cloes not take the case out of the rule.”
Plaintiffs also cite Marbury v. Brooks, 7 Wheat. (U. S.) 556, 5 L. Ed. 522, in which Chief Justice Marshall used the following language:
“To advance money for a son-in-law to repair the frauds he had committed, even with the hope of concealing th© perpetration of them, is not, we think, an offense which may not be excused; nor can a security taken for the repayment of money - so advanced be deemed fraudulent. If the notes were to be taken upon condition that the holders would forbear to prosecute the criminal, or if the repayment of the money advanced were to jlepend upon his escape from prosecution, the validity of the contract might well be questioned. But the undertaking of Marbury was unconditional, as was the security for the repayment of the money advanced. The only feature in the transaction to which blame is attached is the attempt of a father-in-law to conceal the forgeries of a son-in-law, by paying off the notes he had forged. It may be the duty of a citizen to accuse every offender and to proclaim every offense which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man.”
Defendant refers to the fact that after the adjustment had been inade arising out of the first offense, and the commission of a second one by Alexander Walker, the plaintiffs had submitted all the papers to the district attorney, who thereupon indicted Alexander Walker.
We do not think that fact furnishes ground for discharging defendant from payment of the notes. The defense on the notes, if good, would lie in plaintiffs having given an illegal promise of nonprosecution, and not in having broken such promise, if it had been made.
We have given this case much consideration, and are of the opinion that the judgment of the Court of Appeal on the appeal taken to it was erroneous, and the judgment of the district court, which was appealed from, was correct.
Eor the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment of the Court of Appeal herein brought up for review be, and the same is hereby, annulled, avoided, and reversed; and it is now ordered, adjudged, and decreed that the judgment of the district court, appealed to said court, be, and the same is hereby, affirmed.