### AMERICAN FINE ART CO. v. REEVES PULLEY CO.

(Circuit Court of Appeals, Seventh Circuit.   January 5, 1904.)

#### No. 1,000.

1. CONTRACT OBTAINED BY FRAUD—VALIDITY—FAILURE TO READ.

An agent of plaintiff obtained the signature of the secretary of defendant, which was a manufacturing corporation, to an order for lithographed stationery and advertising matter amounting to $15,000, and in excess of defendant's needs for many years, by misrepresenting the contents of the paper and misreading the same. He had previously called on defendant's secretary a number of times, and obtained his confidence as a straightforward business man, and on his statement that the paper conformed to a previous understanding, and contained only authority to register a trade-mark, and a price list at which plaintiff would furnish work as ordered, and that he was in great haste to catch a train, the secretary relied on his reading of the paper, and signed his approval thereon without himself reading it. *Held*, that the secretary was not chargeable with such negligence as precluded defendant from repudiating the order on the ground of fraud on ascertaining its true character.

In Error to the Circuit Court of the United States for the District of Indiana.

Plaintiff in error brought its action for damages for the breach of the following alleged contract:

"Columbus, Ind. April 96.

"Reeves Pulley Co., Columbus, Ind.—Gentlemen:  We shall make application for the registration of your new trade-mark as accepted by you, showing the Reeves Pulley in the cut, with wings spreading from either side, in connection with the characteristic and specific style of the name 'Reeves' as shown on trade-mark drawing, with the understanding that we will charge you only the regular government fee of $25.00 for such application; the making of the necessary patent drawings, filing of application papers with the Commissioner of Patents, and attending to all legal work connected therewith, will be attended to by us without additional cost to you.

"We shall then submit finished sketches of the designs submitted to you today, and approved of by you, for your 'Brownie' booklet, stationery, and announcement hanger; the latter showing the trade-mark with an allegorical figure in connection with the specific style of the name 'Reeves' very large and prominent.  We will furnish you 500 M of the booklets, executed in about 10 colors on cover and two tints inside, at $2^3/_{10}$c a piece; 10 M of each of your stationery headings, viz: letterheads, half letterheads, business cards, envelopes, billheads $8\frac{1}{2}$x7, billheads $8\frac{1}{2}$x$4\frac{2}{3}$ and statements, all to embody your trade-mark in colors, at $9.75 per M; 10 M announcement hangers in about 10 colors and gold, tinned top and bottom, at $27\frac{1}{2}$c each.  All prices are made F. O. B. our factory, it being understood that no charge will be made for any finished sketches which may not meet with your approval, but we understand that in such event, you will treat same confidentially, enabling us to use the same sketches elsewhere.  The registration of trade-mark is to be applied for in your behalf, and the certificate of registration to be turned over to you as soon as same is received from the Commissioner of Patents.

"Yours very truly,                          The American Fine Art Co.
"By C. J. Smith.

"Accepted:  Reeves Pulley Co.  H. H. Reeves, Sec. & Treas."

Defendant answered as follows:  "Reeves Pulley Company, defendant in the above-entitled cause, for answer to plaintiff's complaint herein, says that it denies that it ever entered into the alleged contract or agreement purported to be evidenced by the instrument sued on herein, but avers that the defendant's signature was obtained to said instrument through the fraud of the plaintiff and the plaintiff's agent in the manner and by the tricks and ar-

tifices and under the circumstances and upon the understanding hereinafter averred, and not otherwise or differently.

"Defendant avers: That on or about the 1st of April, 1896, a man giving his name as C. Johnston Smith came to defendant's office in the city of Columbus, Ind., and represented to defendant's secretary and treasurer, G. L. Reeves, that he (said Smith) was agent for the American Fine Art Company, plaintiff herein, and that said company was specialists in artistic lithographing, and desired to know if there was anything in which he could interest the defendant in the line named. That said Reeves replied that there was not. That, after dwelling at considerable length upon the highly artistic class of work done by his company and some general trade gossip, said Smith asked said Reeves if defendant had a registered trade-mark, to which he was answered in the negative. Said Smith then asked if defendant ever thought about having such trade-mark, and was told that the matter had been given some thought. Said Smith then represented that his said company made a specialty of designing and registering trade-marks, and that he would be pleased to submit a design of trade-mark, and, if it met with said Reeves's approval, said Smith would have it registered, and the only expense to said Reeves in the entire transaction would be the $25 government registration fee. In response said Reeves inquired of said Smith, 'Where does the American Fine Art Company come in on such transaction?' To which said Smith replied that by executing a highly artistic trade-mark they hoped to get defendant to adopt the same upon their general line of printed matter and stationery; that the adoption of the trademark in this manner would lead to their securing the defendant's general line of business, inasmuch as plaintiff would have designed the trade-mark and had it registered, and was prepared to make prices that would be satisfactory, stating that plaintiff would furnish defendant such matter as it saw fit to order, for prices which he at the time named. To this said Reeves replied that upon such conditions he should have no objection to the submission of these designs of trade-mark. Further discussion of said matter at said time led said Reeves to remark that he had been thinking some of issuing a humorous pictorial booklet, illustrating by a series of pictures the relative merits of defendant's particular line of wood split-pulleys; that they usually got out an issue of about 10,000 booklets each year. That said Smith inquired into said Reeves's ideas of such a booklet, and said he would be very glad to take the matter up with their artist, and have him make some rough sketches of same, and submit it to said Reeves at the same time he did the trade-mark. Said Reeves further mentioned that it was defendant's practice to get out an issue at about Christmas time from 75 to 100 artistic hangers and posters advertising for defendant's jobbing trade. And said Smith said he would be glad to let said Reeves see some designs of that also with the trade-mark, to which said Reeves assented. All of said designs to be without expense to said defendant.

"Subsequently, and some time before the 26th day of April, 1896, said Smith again came to defendant's office on what appeared at the time to be purely a social call, but, as defendant now believes and avers to be true, was with a view of getting into the good graces and confidence of said Reeves, to the end that said Smith might ultimately through such confidence, when the time should arrive to consummate the deal which said Smith expected to close, be able to take advantage of said Reeves's confidence to throw him off his guard and obtain the signature of defendant to the instrument herein, for an order which said Smith knew was largely in excess of the needs of defendant's business.

"That on or about the 27th day of April, 1896, said Smith submitted to said Reeves rough pencil or ink designs of the trade-mark, booklet (which he termed the 'Brownie Booklet'), and the poster or hanger, all of which appeared to be artistic in so far as they had gone, and in that respect met the approval of said Reeves. That said Smith then spoke of the registration of the trade-mark and said that, in order that plaintiff might get it registered, defendant would have to give power of attorney; that he would have this paper prepared, and submit it to said Reeves in a day or two.

"That on or about the 29th day of April, 1896, said Smith again called, coming into defendant's office hurriedly, and stating that he was desirous of

catching a train which would soon pass through said city of Columbus; that he had the power of attorney prepared, ready for signature, and that he had a formal paper prepared, authorizing the American Fine Art Company to register the trade-mark, combining with said authority price lists which he had prepared, embracing such materials in the lines named as defendant might find need of in the future, and from which schedule or price list defendant could order from time to time as its requirements would necessitate. That said Smith read the instrument in suit to said Reeves, reading in full those paragraphs relating to the trade-mark, and simply reading the prices at which plaintiff proposed to furnish defendant the different kinds of materials, including stationery, booklets, and hangers, and omitting entirely the amounts of the various supplies as now specified therein. That he drew his watch from his pocket some two or three times, and remarked that he did not want to miss his train. Whereupon said Smith asked said Reeves to sign the paper authorizing them to register said trade-mark; also as indicating to his company that he had called upon defendant and submitted a price list or schedule, and that the prices were satisfactory. That said Smith was a person of pleasing personality, intelligent, of gentlemanly address and a good conversationalist, and had ingratiated himself, as a good business man, into the confidence of said Reeves. That said Reeves, by reason of his confidence and of the duress of circumstances so created by said Smith, as hereinbefore averred, did not read said instrument, but trusted to the same being fully and correctly read and represented by said Smith, who volunteered and assumed to read the same.

"And the defendant avers that the acts and conduct of said Smith, as agent of the plaintiff, hereinbefore averred, were for the purpose and with the intent of fraudulently concealing from the said Reeves the true nature and character of the contents of said paper set out in plaintiff's complaint as the basis of plaintiff's cause of action, and for the purpose of inducing said Reeves to believe that the same related only to the procuring of said trade-mark and to a schedule or list of prices at which plaintiff proposed to furnish to the defendant, booklets, hangers, letterheads, etc., and said Reeves at the time believed that the contents of said paper had been truthfully and correctly read and represented to him by said Smith, and in such belief, without any knowledge to the contrary, signed said paper as requested.

"That thereafter, on, to wit, the 18th day of May, 1896, the said Smith again called at the defendant's said office for the purpose of securing the approval of defendant to said finished sketches and designs, and that said Reeves at said time approved the sketches of trade-mark, hanger, and the Brownie Booklet, subject to certain changes at the time suggested and marked thereon, and at the same time and in pursuance of the conversations, understanding, and agreement theretofore had by and between said Reeves and said Smith, whereby said defendant was permitted to order from time to time any booklets, hangers, or letterheads at and for the prices read by said Smith to him as aforesaid, gave to said Smith an order for ten thousand Brownie Booklets and five thousand letterheads, and said order was accepted by said Smith on behalf of said plaintiff.

"That defendant, on to wit, the 20th day of May, 1896, for the first time discovered the fraud perpetrated upon it in the procurement of the signature of defendant to the instrument sued on herein, and that defendant immediately wired to said plaintiff, countermanding and rescinding the alleged contract evidenced by the said instrument sued on, because of the fraud in its procurement as foresaid.

"Wherefore said defendant says plaintiff ought not to recover herein." .

Plaintiff demurred on the ground that the answer did not state facts sufficient to constitute a defense. The court overruled the demurrer, and, on plaintiff's refusal to plead further, entered the judgment to which this writ of error is addressed.

Theodore Kronsage and Wm. A. Pickens, for plaintiff in error.
Charles S. Baker and Charles W. Smith, for defendant in error.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Undoubtedly the general rule is that in signing a contract one party may not blindly rely on the representations of the other. The point to emphasize, however, is that the rule was not adopted to advantage the trickster, but to reprove the victim's negligent failure to use the means at command to protect himself. No contract that has been procured by fraud should be enforced; and, if relief is denied, it is not on the bare fact that the signer has failed to use his opportunities to read and study and understand the contract for himself, but because his failure to discover the fraud that was being practiced upon him was negligent.

The first inquiry here is whether plaintiff practiced a fraud upon defendant. Smith learned from Reeves that defendant stood in no present need of stationery, but would soon be sending out 10,000 booklets and 100 hangers, as was its custom to do annually. He proposed to design and procure the registration of a trade-mark for defendant without expense except the government fee, and, in response to a question how that would benefit plaintiff, replied that plaintiff would hope thereby to secure defendant's general line of printing. So Reeves, after approving the design for a trade-mark, agreed to sign a contract whereby his company would be bound for the government fee and no more, and plaintiff would furnish supplies as thereafter ordered at prices then fixed. But plaintiff seeks to hold a contract for the immediate delivery of $15,000 worth of supplies, including, among other items, enough booklets to meet defendant's need for 50 years and hangers for 100 years. If a fair and honest dealer, knowing the requirements of defendant's business, had received by mail an order for such grossly disproportionate quantities, he would not have filled it without inquiry. To take deliberately such an order from one who is known to be unaware is the rankest fraud. Of this, plaintiff does not make much question, but relies upon the contention that Reeves's failure to read the paper was inexcusable.

During a month's business intercourse Smith added a social call. He aimed to win Reeves's confidence and succeeded. There resulted no relation, such as exists between attorney and client and the like, to justify, of itself, Reeves's failure to read and understand what he was signing. But the confidence which rightly exists between honest business men was designedly inspired by Smith as one step towards enabling him to perpetrate successfully what plaintiff calls a cheap trick that should have fooled no one, but which in fact deprived Reeves of the opportunity of realizing the true nature of the paper he signed.

The next step, after Smith and Reeves had reached an agreement, was for Smith to volunteer to retire and prepare an instrument that should express their understanding. Reeves, of course, was busy with the various duties of his position. Smith had nothing to do but to consult Reeves's convenience and save him time. What was more natural than that Smith should go off, and come back in a day or two with the paper already drawn up?

Then consider the form of the instrument. If the quantities were omitted, the proposition would read in exact accordance with Reeves's

understanding—it would simply be an authorization to secure a trademark, and a list of prices at which goods might be ordered in the future. And more than a casual glance would be needed to impress one to whom the paper was handed that the presence of 500 M and 10 M could transform a power of attorney and a price list into a purchase of $15,000 worth of supplies.

When Smith returned, he was in a great hurry. His train would be due in a few minutes. Before the train would leave, there was only time for one person to read over the paper in full. Smith had the document in his hand and started to read it aloud. Of course, it was Reeves's duty to use his sense of hearing to find out whether the instrument as drawn truly expressed the contract made in their oral negotiations. But it illy becomes plaintiff to insist that he was bound at his peril to stop the reading and take the paper out of the hands of the apparently honest and gentlemanly agent. As Smith read it, the contract was all right. He was then snapping his watch, and did not have a moment to lose. There was no time left for Reeves to read it fully. A hurried glance over it failed to reveal the catch. And now plaintiff seeks to gather the fruits of the cheap trick on the ground that Reeves either should have been guilty of the discourtesy of compelling an honest business man to miss his train, or should have discovered that the man who had won his confidence was a scoundrel.

Plaintiff admits that if Smith, by prestidigitation in the shuffling of papers, had got Reeves's signature to a contract different from one he intended to sign, defendant would be entitled to relief. But we think the tricks that excuse should not be limited to feats of legerdemain.

The judgment is affirmed.