## J. WEIL & COMPANY *vs.* QUIDNICK MANUFACTURING COMPANY.

### JULY 7, 1911.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Contracts. Fraud. Negligence.*

A person is bound by an agreement to which he has assented where his assent is uninfluenced by fraud, violence, undue influence or the like and he will not be permitted to say that he did not intend to agree to its terms.

It is the duty of every contracting party to learn and know the contents of a written contract before he signs and delivers it.

But where one party is induced by false statements of the other to sign the same he is not bound thereby and may defend on the ground of fraud even though he was negligent in signing without reading it.

(2) *Contracts. Fraud. Negligence. Question for Jury.*

In an action to recover the price of goods sold, defendant's testimony tended to prove that plaintiff wrote an order for what defendant had not agreed to buy on the chance of its not being read. The testimony of plaintiff was contradictory.

*Held*, that the case should have been submitted to the jury since when plaintiff undertook to write the order he was bound to write it according to the agreement and if it did not embody the agreement and was signed by inadvertence or negligence that would not preclude defendant from avoiding it on the ground of fraud.

BLODGETT J. dissents.,

ASSUMPSIT. Heard on exceptions of defendant and sustained.

JOHNSON, J. This is an action in assumpsit brought by J. Weil and Company of the city and State of New York against the Quidnick Manufacturing Company, a corporation incorporated under the laws of the State of Rhode Island, to recover the amount due on a bill of goods sold and delivered to the defendant on its written order. The case was tried before a justice of the Superior Court with a jury on the tenth day of January, 1911. Upon the conclusion of the defendant's testimony, the trial justice directed the jury to return a verdict for the plaintiffs for the full amount

of their claim, and a verdict was returned for the plaintiffs for $769.19. The defendant duly excepted to said direction of a verdict. Several exceptions were also taken by the defendant during the trial to the rulings of the court excluding testimony offered. Defendant's bill of exceptions was duly allowed and the case is now before this court on said bill of exceptions. Said exceptions are as follows:

1. "To the exclusion of answer of the witness Villard to question 47 on page 11 of the record."

2. "To the exclusion of answers of the witness Hambly to questions 19 and 20 on page 31, to question 21 on page 32, to questions 22 and 23 on page 34."

3. "To the exclusion of answers of the witness Nickerson to questions 6 and 7 on page 42, to questions 8, 9, and 10 on page 43."

4. "And to the court's direction of a verdict for plaintiffs as shown on page 44 of the transcript."

The plaintiffs, who are engaged in the business of manufacturing and selling steel and steel files, had as an agent for selling its said steel one Max Villard. Said Villard went to defendant's office on May 18, 1909, and saw the Superintendent, Alton L. R. Hambly. Villard (p. 4) testified: "Q. 17. What did you have with you in regard to selling? A. I had some little samples which I showed Mr. Hambly and I told him about the steel and everything and he was very much interested and he told me he wants to give me an order. Q. 18. Now, tell us just what was said about that order; how it was arranged? A. Well, I told him that all over every factory they use chisels of octagon. So I told him for chisels we use $\frac{7}{8}$ octagon and $1\frac{3}{4}$ and $1\frac{1}{2}$ square for blacksmiths' tools and I make a little paper. I told him, 'Mr. Hambly, we generally sent out steel in bundles from Europe.' I told Mr. Hambly, 'I will ship you a bundle of 12 bars,' which would be a small order, so Mr. Hambly said, 'All right, you can ship me that.' I said to Mr. Hambly, 'Kindly give me a written order' and he went up with my little paper to the stenographer and told

the stenographer just exactly give him a little order like this. Q. 19. Did he sign that order which he gave to you? A. It was handed later on to me by Mr. Hambly and signed by Mr. Hambly. Q. 20. I hand you this paper and ask you if that is the order which you took? A. Yes, this is the order what I took." The order was put in evidence as Plaintiffs' Exhibit A. and was as follows:

"QUIDNICK MANUFACTURING Co.

SUPT'S OFFICE:        QUIDNICK, R. I., May 18, 1909.

A. L. R. HAMBLY, SUPT.

J. WEILL & Co.,

MULHOUSE, ALSACE.

GENTLEMEN:

Please enter our order for the following Tool Steel:

4 bars  ⅞″ Octagon for Chisels,

4 bars 1¾″ Square for Blacksmith Tools,

4 bars 1½″ Square for Blacksmith Tools.

Length of Bars, 15 ft. to 18 ft. long, 49 cents Lb., F. O. B. Quidnick, R. I.

Yours truly,

QUIDNICK MFG. Co.,

A. L. R. HAMBLY, SUPT."

"Q. 24. Now, Mr. Villard, after taking that order what did you do? A. Well, then I thank Mr. Hambly for it and I hope he will be very satisfied with the steel and everything like that and then I went away again. Q. 25. Did you send it to your house? A. I sent it to my house then. Q. 26. How long were you with Mr. Hambly in all? A. Perhaps half an hour, something like that. Q. 27. Was any copy of this order, which is marked Exhibit A. taken by Mr. Hambly? A. I couldn't say exactly but when Mr. Hambly handed me out this order I asked Mr. Hambly if he took a copy of this so Mr. Hambly went up to the stenographer and asked the stenographer if he took a copy of this so the stenographer said, 'We have a copy of this gentleman's writing, that little slip; it is not necessary,'

and then Mr. Hambly said, 'No, it is not necessary.'  Q. 28. That was the little slip you yourself wrote?  A.  I wrote myself.  Q. 29.  I will ask you if that is yours, the copy you made?  A.  Yes, sir, it is my copy."  The paper was put in evidence as Plaintiffs' Exhibit B. and was as follows:

"J. WEILL & CO.                    MULHOUSE,
                                        (ALSACE)

4 Bars  ⅞″ octagon for chisels
4 Bars  1¾″ square for Blacks. Tools
4 Bars  1½″ square for Blacks. Tools
                 49 cents per lb. f. o. b.
              Bars from 15 to 18 ft. long."

"Q. 30.  This is what you wrote?  A.  This is what I wrote. Q. 31.  This is in your own handwriting?  A.  My own handwriting."  He testified that the steel was shipped to the Quidnick Manufacturing Company and refused.  Asked, "Where is it now, as far as you know?"  he answered, "Well, it is lying in some warehouse, I think.  The company refused to accept it again.  Q.  The Weill Company refused it also?  A.  Yes."  He said he didn't know how much the steel weighed.

Mr. Hambly testified (p. 28):  "Q. 7.  What were you doing when he came?  A.. I think I was in my private office when he came.  Q. 8.  Well, now, tell what was said by him and by you.  A.  I came out of my private office, and saw him at the door of the glass partition in our main office and he stated his business.  Q. 9.  What did he say?  A.  Said he had a specially treated steel he would like to have us try. Q. 10.  He had testified he had small samples of pieces of steel.  Was that so?  A.  I don't remember of seeing any samples at all.  Q. 11.  Well, now, go on.  A.  I told him we were a small cotton mill and used very little steel and he urged me very strongly to try a sample of it and at last I told him I would take a sample of the smallest possible quantity he could possibly send and he asked for a piece of paper to write out an order.  We gave him a piece of

paper and he wrote out in lead pencil the order which you see there and he asked to have it typewritten and signed. He laid it on the desk and during that time I was talking with another salesman at the door of the glass partition. Previous to that he came inside and sat down on an armchair and wrote that on a table with a lead pencil. While he was writing it I was talking with another salesman at the door. After he had signed it he laid it on the desk. Q. 12. What did you mean by saying that he signed it? A. After he wrote out the lead pencil order he laid it on the desk and the clerk took it and went to the typewriter and wrote it. Q. 13. How did the paper come to the typewriter? A. He saw it lying on the desk there and took it up and went to the typewriter. Q. 14. What, if anything, did Villard say about an order before he wrote it; I mean a written order? A. Said he would like to have a written order signed by me. Q. 15. After he had written the pencil one what occasion was there for having it typewritten? Who spoke about having it typewritten? A. I don't think anyone did. It was laying on the desk and the clerk got right up and took it. He understood he was to typewrite it. Q. 16. Then what happened? A. After the clerk had written it on the typewriter he laid it on the desk. We have a large square desk in the center of the office and the clerk sat at one side of the desk; on the other side was a chair. After he wrote on the typewriter he laid it on the opposite side of the desk where the vacant chair was. I stepped back from talking with the other salesman, took my pen and signed it. While I was signing it he began to talk about his native country, Switzerland, what a beautiful country it was and when I signed it I went back talking to the salesman and he passed out of the office. Q. 17. Who came first, this other salesman or Villard? A. I think they both reached there about the same time. Q. 18. How long did you talk with Villard. A. I shouldn't think over 15 minutes." (p. 35) "Q. 24. Whose proposal was it first that a written order should be made? A. Mr. Villard's. Q. 25. When was the next

that you heard anything about this steel or this order?
A. June 16th, 4 or 5 weeks afterward.   Q. 26. And what
did you hear then?   A. I received a letter from them con-
taining invoice and bill of lading for the shipment of the
steel.   Q. 27.  What reply did you make or what did you do?
A. I wrote them immediately the same day, June 16th, that
I was returning invoice and bill of lading enclosed and
should not accept shipment of steel.   Q. 28.  Did you give
the reason?   A. Yes, I said it was a quantity that would
take us a good many years to use.   Q. 29.  Look at that
letter and tell what reason you gave for not accepting?
(Hands letter to witness)   A. That is the letter I wrote.
Q. 30.  What is that?   A. That is the letter I wrote.
Q. 31. ·What reason did you give for not accepting it?
A. Because the quantity was so large, I ordered a sample
order.   I didn't order any such large size shipment as that.
Q. 32.  That you say you sent the day you received their
bill?   A. June 16th.   Q. 33.  What became of the steel
afterward?   A. It arrived at our freight station two days
afterward, I think, and was returned immediately; wasn't
taken from the car.   C. Q. 34.  I will hand you this letter
dated June 17th, and ask you if that was received by the
Quidnick Manufacturing Company?   A. Yes, it was.   Mr.
Hahn:   Now, as much of it as is material, as we have agreed
upon, I will read to the jury.   'Quidnick Manufacturing
Company, Quidnick, R. I., June 17th, 1909.   From the
Universal Forwarding Company.   Gentlemen:   In answer
to your letter of the 16th inst. we beg to say we can't take
the steel back.   Your order has been executed exactly
as per your written contract.   We return enclosed bill of
lading and invoice.'   C. Q. 35.  Mr. Hambly, I don't
know whether it has been asked of you, but I want it to
go on the record at any rate.   You can read and write?
A. I can."   Mr. Hambly, p. 40, said he did not remember
Villard's saying the Weil Company would not ship an order
for less than twelve bars; that nothing was said by Villard
as to what a sample consisted of, or how big or long it was;

that Villard did not say anything about what the size of the sample would be; that nothing was said at the interview between Villard and himself about the price of the steel. Outside of Villard's getting the order and the refusal of the steel by the defendant, the evidence of Villard and Hambly is contradictory. Hambly says that he told Villard he would take a sample of the smallest possible quantity he could send. Villard denies anything being said about a sample. He says he told Hambly that twelve bars was the smallest amount his company would ship. He said nothing as to the weight of such a shipment, and says he did not know what the weight would be or what it would come to at 49 cents a pound. After Hambly said he would give the order, Villard wrote out the slip, the order was typewritten, the word "Quidnick" was added after the letters "f. o. b.," and Hambly signed without reading either the slip or the type-written order. Villard took the order and Hambly renewed his talk with the other salesman. Outside of his depending on the order being for a sample, there appears to have been no reason other than his preoccupation for his not reading the paper, though he says Villard at that point began talking about Switzerland, and extolling its beauties.

(1) The general rule of law is that a person is bound by an agreement to which he has assented, where his assent is uninfluenced by fraud, violence, undue influence, or the like, and he will not be permitted to say that he did not intend to agree to its terms.

As a written contract is the highest evidence of the terms of an agreement between the parties to it, it is the duty of every contracting party to learn and know its contents before he signs and delivers it. 9 Cyc. 388.

"Of course if the other party induces the signer to sign the paper without reading it, and to rely on his statement of the contents, this may give the signer a right, if the statement was fraudulent, to avoid the contract as against him on the ground of fraud." 9 Cyc. 390.

In *Trambly* v. *Ricard*, 130 Mass. 259, 261, the court

said: "But beyond this (the fact of plaintiff's illiteracy), the evidence offered by the plaintiff, which the jury might have fully believed, tended to show that the written contract was produced by the defendants immediately after an oral contract for the unconditional sale and delivery of the furniture was completed. The jury may well have found that the production of the writing at the time was in itself an affirmation on the part of the defendants that its terms did not differ from the terms of the sale agreed on. Fraud may be proved from the acts and conduct of a party quite as effectively as from his declarations." . . . "And any act falsely intended to induce a party to believe in the existence of some other material fact, and having the effect of producing such belief to his injury, is fraud." The agreement was for absolute purchase of furniture and the paper a clingfast.

See also *Freedley* v. *French*, 154 Mass. 339; *Peaslee* v. *Peaslee*, 147 Mass. 171, 180; *O'Donnell* v. *Clinton*, 145 Mass. 461; *Smith* v. *Holyoke*, 112 Mass. 517; *Bliss* v. *N. Y. etc. Railroad*, 160 Mass. 447; *Burlington etc. Co.* v. *Evans etc. Co.* 100 Iowa, 469; *Wright* v. *McPike*, 70 Mo. 175; *Girard* v. *St. Louis etc. Co.* 123 Mo. 358; *Cummings* v. *Ross*, 90 Cal. 68; *Wood* v. *Cincinnati Co.* 96 Ga. 120.

There is ample authority that as between the parties to a written contract where one party is induced by the false statements of the other to sign the same, he is not bound thereby and may defend against the contract on the ground of fraud even though he was negligent in signing without reading it.

In *Linington* v. *Strong*, 107 Ill. 295, 302, the court say "The doctrine is well settled, that as a rule, a party guilty of fraudulent conduct shall not be allowed to say 'Negligence,' as against his own deliberate fraud. Even where parties are dealing at arm's length, if one of them makes to the other a positive statement, upon which the other acts (with the knowledge of the party making such statement) in confidence of its truth, and such statement is

*known to be false* by the party making it, such conduct is fraudulent, and from it the party guilty of fraud can take no benefit," and p. 303: "He cannot escape the legal consequences of his fraudulent conduct by saying the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." See also *Woodbridge* v. *DeWitt*, 51 Neb. 98; *Eggleston* v. *Advance &c. Co.* 96 Minn. 241, 246; *Houston &c. Co.* v. *Burns*, 63 S. W. 1035; *Alexander* v. *Brogley*, 62 N. J. L. 584; *McBride* v. *Macon &c. Co.* 102 Ga. 422; *Cullmans* v. *Lindsay*, 114 Pa. St. 166; *Sidney &c. Co.* v. *Warsaw*, 130 Pa. St. 76; *American &c. Co.* v. *Reeves*, 127 Fed. 808; *Albany etc. Bank* v. *Burdick*, 87 N. Y. 40.

The dealings as to the order were entirely through Villard and Hambly representing the parties.

(2)     If Hambly's story is correct, the situation was that Villard wrote an order for what Hambly had not agreed to buy, on the chance of its not being read. Misrepresentation by conduct is as dangerous as by words. When he undertook to write the order he was bound to write it according to the agreement and if it did not embody the agreement and was signed by inadvertence or negligence, that would not preclude the defendant from avoiding it on the ground of fraud, by Villard, in the procurement of Hambly's signature to it. Upon this point the testimony of Villard and Hambly is flatly contradictory. We think that on the evidence the case should have gone to the jury.

The defendant takes nothing by its first, second and third exceptions.

The defendant's fourth exception to the court's direction of a verdict for the plaintiffs is sustained, and the case is remitted to the Superior Court for a new trial.

BLODGETT, J. dissents.

*J. Jerome Hahn, P. H. Mulholland*, for plaintiff.
*Doran & Flanagan*, for defendant.