ABBY D. PEASLEE *vs.* BYRON L. PEASLEE & others.

BYRON L. PEASLEE & others *vs.* ABBY D. PEASLEE.

Essex.    November 3, 1887. — June 19, 1888.

Present : MORTON, C. J., FIELD, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Marriage — Divorce — Jurisdiction — Notice — Service — Presumption — Husband and Wife — Antenuptial Contract — Dower — Jointure — Fraudulent Representation — Waiver — Election — Ratification — Evidence — Admission — Record Title — Release — Equity Practice — Practice — Condition — Judgment.*

Under the St. of 1870, c. 404, § 3, providing that decrees of divorce *nisi* might be made absolute, no new service was necessary to found jurisdiction for such supplementary proceedings.

On the issue whether a woman's signature to an antenuptial contract was procured by fraud, she testified that her intended husband had promised to give her $5,000 and a farm worth $5,000; that he told her while she was reading the contract at his lawyer's office to "hurry up and read it," as his horse would not stand; that she said, "I suppose it is just as you talked," to which he replied, "Yes"; and that she thereupon signed it, knowing the contents only from what he had said, the provision for her not being what he had promised; and two other witnesses testified, one that the husband had told him that he promised to settle upon her $10,000, of which the farm was to be a part, the other that he was going to give her that sum in money and property equally. *Held,* that her testimony would warrant a finding that she was induced to sign the contract by a fraudulent misrepresentation of its contents, and that the testimony of the other witnesses was admissible to confirm her evidence.

The antenuptial contract recited that an estate was conveyed to a trustee upon a valuable consideration, and provided that the wife should receive the rents and profits thereof during coverture, and that in lieu of dower a conveyance of it was to be made to her upon the husband's death. The marriage took place; the wife received the rents during coverture, and thereafter, in ignorance of her rights, collected a small part thereof, which she offered to return; she refused to accept a conveyance under the agreement, but did not tender a release. *Held,* on a writ of dower, that the wife could not ratify the contract during coverture, and that evidence of her acts and declarations during that time were inadmissible, that she need not return the rents received during coverture, and that those received afterwards would not conclude her. *Held, also,* that it was not necessary for her to tender a release, but that, in order to clear the record title, the filing of such a release might be made a condition of entering judgment.

THE FIRST CASE was a writ of dower, dated October 13, 1885, by the widow of Hiram Peaslee against his devisees. Plea, 1st, that the marriage between the demandant and the devisor was invalid; 2d, that an antenuptial contract between

them constituted an equitable defence to the action. Replication, that the demandant's signature to such agreement was secured by fraud. Trial in the Superior Court, before *Hammond*, J., who allowed a bill of exceptions, which, so far as material, were as follows.

It appeared in evidence that the demandant previously was married to Andrew C. Rowe, who was living on January 20, 1873, the date of her marriage to Hiram Peaslee, and that the demandant obtained a divorce from bed and board against Rowe, on November 4, 1868, in the Supreme Judicial Court holden within and for the county of Middlesex. The demandant introduced in evidence the record of that court, which recited that personal service of the demandant's libel was made upon Rowe, and that the divorce was granted to her upon his default; that on April 25, 1872, she filed a petition that the divorce might be made absolute; and that a decree was made, which, after reciting the prayer of the petition, set forth that "the petitioner appears, and the court, on this twenty-fourth day of May, A. D. 1872, do grant the prayer of said petition. It is therefore, on this twenty-fourth day of May, A. D. 1872, considered by the court that the decree of divorce from the bond of matrimony heretofore entered into between the said Abby D. Rowe and the said Andrew C. Rowe be made absolute"; but the record did not disclose any order of notice or notice to Rowe of this petition. The judge ruled that, as matter of law, the demandant was lawfully married to Hiram Peaslee.

The antenuptial contract, dated January 17, 1873, was duly executed and recorded, and after reciting the intended marriage of the parties, and that Peaslee was possessed of land described, with the buildings thereon, situated in Plaistow, New Hampshire, on the northerly side of a certain road, set forth that Peaslee, in consideration of ten dollars paid to him by the trustee, receipt of which was acknowledged, "doth hereby give, grant, bargain, sell, and convey" all that land to a trustee, upon the special trusts, "that from and after the solemnization of the said intended marriage, and during the lifetime of the said Hiram Peaslee, the said trustee shall hold the said estate to and for the sole use of the said Abby D. Rowe, and shall empower her to receive for her own use all the rents, income, and profit arising

from or out of the said trust estate ; and that in case of the decease of the said Hiram Peaslee, after the solemnization of said marriage, and during the life of the said Abby D. Rowe, the said trustee shall forthwith convey and transfer to said Abby D. Rowe, in fee simple, said trust estate, and shall execute and deliver all such deeds and instruments as may be needful to transfer the said trust estate unto the said Abby D. Rowe, her heirs and assigns forever ; and she stipulates and agrees to receive said transfer, and the same shall be in full satisfaction of her dower, or thirds, which she may claim to have in any lands, tenements, or hereditaments whereof or wherein he, the said Hiram Peaslee, shall at any time during his life be seised or possessed."

The demandant testified, that in April, 1872, Peaslee, when he proposed marriage to her, promised to give her $5,000 and a farm worth $5,000 ; that he pointed out to her, as the farm that he proposed to give her, a farm at Plaistow, consisting of lands on both sides of the road, as well as other land in the vicinity, and said that he had once sold this farm for $5,000, afterwards buying it back and laying out a large sum in repairs on it ; that, at the time the agreement was signed by Peaslee and herself, the demandant had no knowledge of its contents except from statements by Peaslee ; that she began to read it at his lawyer's office, to which he had taken her, and had read not quite half of it, as she thought, when Peaslee, who was walking the floor and looking out of the window, remarked that his horse would not stand, and told her to " hurry up and read it as soon as you can " ; and that she said to him, " I suppose it is just as you talked," and he said, " Yes," and she signed it. There was evidence that the entire farm was worth about $1,600, and that the portion described in the antenuptial agreement was a part only of the farm, on the northerly side of the road ; that the statements of Peaslee as to the value of the farm were false, and that the portion described in the agreement was worth less than $1,000.

Isaac C. Pear testified that the demandant told him, in a conversation had with her after the engagement, that she had had a proposal of marriage from Peaslee, and that Peaslee proposed to make a settlement upon her ; that Peaslee then came into the

room, and joined in the conversation; and that Peaslee said that he proposed to settle on her $10,000, of which the farm in Plaistow was to be a part.    Ellen I. Smith testified that Peaslee told her, but not in the demandant's presence, that, " if he married Mrs. Rowe, he was going to give her ten thousand dollars in money; he was going to give her five thousand dollars in money and five thousand in property, the farm included, I supposed." The tenants objected to the admission of this evidence; but the judge admitted it, saying he would leave it to the jury to say whether this was an expression of intention, or the admission of an oral contract already made, and that, so far as it was a mere expression of his intention, the jury should disregard it.

The tenants contended that, if the demandant's signature to the antenuptial contract was obtained by fraud, she had ratified and confirmed it after a full knowledge of its contents and effect, and offered evidence of various acts and declarations of the demandant's, extending from her marriage with Peaslee until after his death, and tending to show such a ratification.    This evidence tended to show, among other things, that the demandant, during coverture and after she knew the contents of the antenuptial contract, took possession of the farm in Plaistow, orally leased it, took the rents and profits, paid the taxes, and tried to sell it; and that the demandant having in writing, on October 27, 1875, consented to separate from Peaslee, and agreed for $5,000 never to call on him for further assistance, Peaslee, on October 29, 1875, made a promissory note payable to one as trustee, from whom he took a declaration of trust of even date, reciting that the note was to be held for the benefit of the demandant during Peaslee's life, and that, at his decease, the amount was to be collected from his estate and paid to her, if then his widow.    The judge excluded all evidence of acts or declarations during coverture tending to show such ratification.    All the acts and declarations of the demandant after the death of Peaslee tending to show ratification were admitted, and instructions as to their effect were given, which were not excepted to.

The tenants offered evidence tending to prove that, at the time of Hiram Peaslee's death, there was a tenant occupying the house and using the furniture of the demandant, and that

the demandant collected rent on account of the house and furniture for the month following his death; that at the time she collected it, she had no knowledge or information that she would thereby forfeit her right of dower, and that she was ready and willing to pay the money into court, for the benefit of whomsoever it might concern; and during the trial the demandant tendered to the tenants' counsel, and paid into court, the sum of eighteen dollars, which was more than the amount received for the rent of the house and the use of the furniture, and interest on the same.

The tenants introduced evidence tending to prove that the trustee under the antenuptial agreement died before Hiram Peaslee; that an administrator of such trustee's estate was duly appointed, who after Peaslee's death duly obtained a license to convey the estate contemplated by the agreement to the demandant; that a deed duly executed by such administrator was tendered, at the tenants' request, to the demandant, and refused by her. Section 10 of the General Statutes of New Hampshire, of 1878, c. 205, put in evidence by the tenant, was as follows: "When any person deceased shall, at the time of his death, hold any real estate in trust for the use of another, and there is no dispute as to the trust or title of the deceased therein, the judge for the county in which such real estate is situate, upon application and notice, may license the executor or administrator of such deceased person to convey such real estate to the person for whose use the same was holden in trust by the deceased, or to such other person as may be designated by said judge."

There was evidence that Hiram Peaslee died on July 11, 1885, testate; that his will contained the following clause: "I make no provision, in this my last will, for my wife, Abby D. Peaslee, because I have provided for her in an antenuptial contract and deed, dated January 17th, A. D. 1873"; and that the demandant filed a waiver of the provisions of his will on August 6, 1885, and made a demand for dower on August 29, 1885; but there was no other evidence of a rescission or of an election to waive the contemplated contract, or that the demandant had ever offered to release her rights under it to the devisees, or requested the trustee to do it.

The tenants requested the judge to instruct the jury, in substance, that upon all the evidence the demandant could not recover; that there was no valid marriage between the demandant and Peaslee; that there was no evidence of an election by the demandant to waive the jointure; that the contract was not absolutely void, but voidable; that the contract was not voidable at law for the fraud alleged by the demandant; that the demandant could not avoid the antenuptial contract for fraud, without first having returned all the benefits that she had received under it; and that the agreement could be ratified during the marriage.

The judge refused so to instruct, but gave instructions that were not excepted to, save so far as they were inconsistent with the instructions requested. The jury answered the question, " Was the demandant induced to sign the antenuptial contract by the fraud of her intended husband, Peaslee ? " in the affirmative, and returned a verdict for the demandant; and the tenants alleged exceptions.

THE SECOND CASE was a bill in equity, brought by the devisees of Hiram Peaslee to restrain his widow from prosecuting her action at law because of the antenuptial contract. The defendant demurred for want of equity. *C. Allen,* J., sustained the demurrer; and the plaintiffs appealed to the full court.

*H. Carter & B. B. Jones,* for the widow.

*C. U. Bell & W. H. Moody,* for the devisees.

HOLMES, J. The first case is a writ of dower brought by Abby D. Peaslee as the widow of Hiram Peaslee, against his devisees. The tenants deny the validity of the marriage, and set up an antenuptial contract by way of equitable defence. The second case is a bill in equity brought by the tenants, to enjoin the action at law against them, on the ground of the same antenuptial agreement. It comes here upon appeal from a decree sustaining a demurrer, but the bill is not pressed, unless it is necessary to protect the tenants' equitable rights, and as the facts were tried in the action at law and all the questions sought to be raised are raised there, we shall confine our discussion to the latter. St. 1883, c. 223, § 14. *Freeland* v. *Freeland,* 128 Mass. 509, 512.

The first question raised is whether the demandant's marriage to Hiram Peaslee was valid. She had been married previously to one Rowe, who was living at the time of her marriage to Peaslee in 1873. She obtained a divorce from bed and board against Rowe on November 4, 1868. On April 25, 1872, she filed a petition to make the decree absolute, and on May 24, 1872, a decree was passed purporting to make absolute the divorce from the bonds of matrimony. The record shows personal service of the libel on Rowe, and a default by him, but discloses no order of notice or notice to him of the petition.

The proceeding on the petition was under St. 1870, c. 404, which did away with divorce from bed and board, enlarged the number of causes of divorce from the bonds of matrimony, and enacted that, if the libellant prevailed, the court should enter a decree of divorce *nisi*, and that, if the parties should continue to live separately for five consecutive years next after the decree, the court should, upon proof thereof, make said decree absolute, and might make it absolute after the parties had lived apart three consecutive years. The first section provided that all persons then divorced from bed and board should be in the same legal condition as if divorced *nisi* under that act, and this provision, it will be seen, applied to the demandant.

The validity of the provision is established. *Bigelow* v. *Bigelow*, 108 Mass. 38. *Graves* v. *Graves*, 108 Mass. 314, 320. See *Jacquins* v. *Commonwealth*, 9 Cush. 279. The petition to make the decree absolute " takes the place of the libel under the General Statutes [c. 107, § 10] for a divorce from the bond of matrimony after parties divorced from bed and board had continued to live apart for the requisite time." *Graves* v. *Graves*, *ubi supra.* But in this case and in others, the proceeding is spoken of as a new one, upon which the court always ordered notice to the other party. *Garnett* v. *Garnett*, 114 Mass. 379, 380. *Sparhawk* v. *Sparhawk*, 116 Mass. 315, 319. And practically it was dealt with as such, being entered as a new cause, and the records in some counties, although not, we believe, in all, disclosing an order of notice and hearing. Everywhere, of course, the original papers, when complete, show an order of notice, and generally show a compliance with it, either by return or by affidavit, as the case may be.

But when we have to consider whether a divorce accepted by the parties, and on the faith of which the marriage under consideration took place, shall be declared void, at the suggestion of a stranger, for want of jurisdiction, because the record and papers found on file do not show such notice to have been given, the question assumes a different aspect.

It is true, that in practice the proceeding was dealt with as a new one. But this was not necessarily due to any other cause than the length of time intervening between the decree *nisi* and the proceeding to make the decree absolute. Under St. 1870, c. 404, the time to elapse was not less than three or five years, and therefore the old cause went off the docket. But it must be kept in mind that the provisions of that statute were primarily provisions for making absolute decrees *nisi* also made under that statute, and that the further clause giving persons divorced from bed and board the same status as if divorced *nisi* under the statute, was an independent matter on one side. The question how far and in what sense the proceeding was a new one must be discussed with reference only to the proceeding to make absolute a decree *nisi* under the statute.

It seems to us that, by the very terms of the statute, it was a proceeding in the original cause, to make the original decree absolute. The words are, "shall make said decree absolute." Under the earlier statute of 1867, c. 222, when the decree *nisi* was to be made absolute after six months, the cause was continued, and the final decree appeared as part of the original record. The same is true under the present St. 1882, c. 223. There is no such difference in the language or provisions of the act of 1870 as to warrant a different interpretation. The statute does not even say anything about notice, and the language of the court in the cases cited does not purport to be a construction of the statute, but a statement of judicial practice. As the fact that the parties had lived separately was to be proved, and as other grounds for refusing to make the decree absolute might exist, it was very proper to require notice of the application, so that the other party might be present at the hearing if he saw fit, although under the act of 1882, while a petition is always filed, notice is expressly dispensed with by the act, and the burden is thrown on the objecting party of taking his objection in time.

But it is one thing to say that notice will be required on judicial grounds, and another to say that service, or its equivalent, was necessary to found jurisdiction. If the latter had been necessary, it would have been a question for consideration whether a decree could ever have been made absolute without personal service, as the statute, saying nothing about service or notice, of course did not provide expressly for service by publication, although no doubt it might have been held impliedly to adopt the modes of service authorized in the original cause. *Blackinton* v. *Blackinton*, 141 Mass. 432. However this may be, we are of opinion that the proceeding to make a decree *nisi* under the act of 1870 absolute was a continuation of the original proceedings, and that jurisdiction acquired by personal service in the original cause continued until the decree was made absolute. We think that the grounds for this opinion are at least as strong as those on which it has been held that *scire facias* against a trustee is a continuation of the original proceeding, and therefore that a Massachusetts judgment on *scire facias,* without personal service against a trustee who was served in the original action, is conclusive in another State. *Adams* v. *Rowe*, 2 Fairf. 89. See *Nations* v. *Johnson*, 24 How. 195, 205.

If our conclusion is right as to proceedings wholly under the act of 1870, it must govern the present case. As we have said, the validity of the act as applied to existing divorces from bed and board is established by decision. The only effect of our construction is, that a new service was not necessary to found jurisdiction for the supplementary proceedings. But it was patent on the face of the statute that no service was expressly required, and that fact must have been before the mind of the court when making the decisions which we have cited, and it was as obvious then as now that judicial practice could not impart validity to the act if it was not valid without such aid.

However, as the statute was not considered in quite the same light in which it now is presented, we may add that, even if an independent petition *ex parte* had been allowed, it would be hard to see what rights of parties domiciled here would have been impaired, (*Pierce* v. *Burnham*, 4 Met. 303,) or what greater objections could be urged than can be urged against divorces without service or personal notice of the institution of the suit. *Burlen*

v. *Shannon*, 115 Mass. 438. *Pennoyer* v. *Neff*, 95 U. S. 714, 735. *Cheely* v. *Clayton*, 110 U. S. 701, 705.

But the statute did not go to that extent. It did not throw on the party concerned the burden of watching the dockets of all competent courts for a new entry. It simply threw on him, by a statute which he was presumed to know, the burden of noting in a cause to which he was a party his desire to be heard in opposition to the making of a decree. We think it clear, that it was no more necessary, under the statute of 1870, than it is at present, to await the filing of a petition in order to file objections to the decree being made absolute.

If we could construe the act of 1870 as by implication requiring notice, we should be inclined to think that it might be presumed that notice was given, without contravening any general proposition as to proceedings not according to the course of the common law. *Commonwealth* v. *Blood*, 97 Mass. 538. See *Henry* v. *Estes*, 127 Mass. 474, 475. The court had jurisdiction of the subject matter, and was the court of the parties' domicil. The justice who made the decree absolute was a member of the bench which stated the practice to be that the court always ordered notice. All the reasons which justify a presumption of jurisdiction in other cases seem to be present here. In *Edds, appellant*, 137 Mass. 346, it was presumed that the Probate Court had satisfied itself, outside the return, that service had been made or ordered. In *Huntington* v. *Charlotte*, 15 Vt. 46, domicil of the parties was presumed in support of the jurisdiction to grant a decree of divorce. See *Grignon* v. *Astor*, 2 How. 319, 340; *Waltz* v. *Borroway*, 25 Ind. 380; *Innerarity* v. *Byrne*, 5 How. 295.

The other questions relate to the antenuptial agreement.

It is enough to say, without more detail, that there was some evidence that the demandant's intended husband induced her, by what might have been thought a pretence, to sign the paper before she had read it through; that she said, "I suppose it is just as you talked," that he said, "Yes," that she believed him and signed it, knowing the contents only from what he said; and that in fact the provision for her was not what he had promised in the talk referred to. This evidence, if believed, warranted a finding that the demandant was induced to sign the paper by a fraudu-

lent misrepresentation of its contents. See *Kline* v. *Kline*, 57 Penn. St. 120.

Hiram Peaslee's alleged conversations with the witnesses Pear and Smith, fairly construed, imported an arrangement with the demandant such as she had testified to, or at least might have been found to have had that meaning, and were therefore admissible in support of that part of her testimony to make out a case of fraud. The jury were instructed to disregard them so far as they were mere expressions of intention. See *Camerlin* v. *Palmer Co.* 10 Allen, 539, 542.

It will not be necessary to consider whether the fraud alleged would have made the agreement voidable or void, nor whether the provision in lieu of dower would be a legal, or only an equitable bar. We shall assume that the instrument was capable of confirmation, at least, and that if confirmed it would be a bar in equity, if not at law.

But we are of opinion that the demandant could not ratify the instrument during coverture. If the provision would have been a legal bar, her power to accept such a provision was governed by statutes which have not been affected by the enlargement in other directions of the powers of married women. See *Mason* v. *Mason*, 140 Mass. 63. Under the Pub. Sts. c. 124, § 9, she could not bar her dower during coverture by any expressions of assent to a provision made for her at that time. See *Bigelow* v. *Hubbard*, 97 Mass. 195. It can make no difference whether the instrument was made before or during coverture. The policy of the law is directed, not against the husband's drawing the instrument, but against the wife's concluding herself by accepting it while under marital influence. If she cannot accept a provision made at one time, she cannot accept one made at another. See *Smith* v. *Lucas*, 18 Ch. D. 531, 544.

This principle of policy is equally applicable to cases not strictly within the statute as to those within its letter. It applies as fully to the ratification of an instrument which purports to have been assented to before marriage, but which the wife has a right to avoid, as to one which is presented to her for the first time after marriage. If the jointure should be deemed an equitable one, it would be governed by the same rule. In this particular, equity would follow the law.

It follows from what we have said, that the court was right in rejecting evidence of acts and declarations during coverture tending to show ratification at that time. It is true that a part of the evidence rejected was of the giving of a note to a trustee for the demandant, coupled with a written assent on her part. But there was no offer to show that she sought to compel the trustee to retain the note after her husband's death, or any offer otherwise to make the receipt of the property the foundation for proof of ratification when the demandant was able to ratify. It is suggested that the acts during coverture were admissible to show the character of the acts after coverture. But the acts of the demandant during coverture, being acts of a person incompetent so to act with legal effect, had no character, and could not be used for adjective any more than for substantive purposes; otherwise the rule which we have laid down would be evaded by a very simple device. See *Lowell* v. *Daniels*, 2 Gray, 161; *Pierce* v. *Chace*, 108 Mass. 254, 259.

But it is argued, and the court was requested to instruct the jury to that effect, that the demandant could not rescind the antenuptial contract without returning all the benefits which she had received under it. The benefits referred to are the marriage itself, certain rents received by the demandant during coverture, a few dollars collected afterwards in ignorance of her rights, which she offered to return at the trial, and the estate or interest purporting to be conveyed by the indenture.

Assuming that the marriage was, in any technical or practical sense, founded in part upon the contract as consideration, it would be pushing *Snow* v. *Alley*, 144 Mass. 546, to undreamed of consequences, were we to hold that the statute bar of dower is irrevocably fixed if a man by any fraud can get his intended wife to execute an antenuptial agreement, or what turns out to be one, and to marry him before she discovers the fraud. In *Johnston* v. *Johnston*, 53 L. J. Ch. 1014, affirmed 52 L. T. (N. S.) 76, the fraud alleged was fraud directed to and inducing a marriage. The settlement made by the husband could only be reached through the marriage, and while the marriage stood the settlement stood. It was intimated that after marriage a settlement could not be avoided for fraud, but some of the American decisions that a fraudulent jointure can be set aside after marriage

were referred to, and seem to have been thought by the Court of Appeal entirely consistent with their intimation. *Kline* v. *Kline, ubi supra. Kline's estate,* 64 Penn. St. 122. *M'Cartee* v. *Teller,* 2 Paige, 511.

The right of dower can be barred only by meeting the requirements of the statute in substance as well as in form, and the cases show that, even when the fraud goes only to the motives for signing, and not to the identity of the instrument, marriage does not cut off the right to rescind, and that, although the marriage is irrevocable, yet, as was said in answer to a proposition not more startling than the one we are discussing, " that account is *in equilibrio.*" *Price* v. *Sears,* 2 Lowell, 553. See *Rau* v. *Von Zedlitz,* 132 Mass. 164, 169.

Then as to the rents collected during the marriage. It will be observed that the instrument under consideration contains two distinct sets of provisions, which are as independent of each other as if contained in separate documents. There is a gift of the rents and profits in trust for the wife during coverture, which may be regarded as a marriage settlement, and there is a provision that the legal estate shall be conveyed to her upon the husband's death, which is the proposed jointure. It is " said transfer," that is, the conveyance after his death, which the wife accepts in satisfaction of dower. The rejection of this provision does not involve the rejection of the independent gifts during coverture, and therefore does not require a return of the rents received during that period.

The collection of a few dollars by the demandant after her husband's death, in ignorance of her rights, if it stands on a different footing from the previous receipt of rents, and the fact that the amount was not formally tendered back until the trial, did not necessarily conclude her. *Watson* v. *Watson,* 128 Mass. 152. *Smith* v. *Holyoke,* 112 Mass. 517. *Rau* v. *Von Zedlitz,* 132 Mass. 164. The bill of exceptions states that all acts tending to show ratification after her husband's death were submitted to the jury with proper instructions.

The alleged jointure is pleaded as an equitable jointure only, and seems to have purported to convey only an equitable estate by the law of New Hampshire, so far as we can rely upon the proceedings under the New Hampshire statute put in evidence

by the tenant. Apart from local statutes, we cannot assume that the law of New Hampshire is different upon this question from that of Massachusetts, and by the law of Massachusetts the use would not be executed under a similar instrument. The trust is for a married woman. The intent manifested by the instrument is that the legal title should remain in the trustee until the death of the grantor, and the demandant is then to acquire a title only by conveyance. Also a consideration purports to have been given by the trustee sufficient to raise a use in him. See *Ayer* v. *Ayer*, 16 Pick. 327; *Richardson* v. *Stodder*, 100 Mass. 528; *Hastings* v. *Merriam*, 117 Mass. 245, 252; *Chapin* v. *Chicopee Universalist Society*, 8 Gray, 580; *Stearns* v. *Palmer*, 10 Met. 32, 35; *Mott* v. *Buxton*, 7 Ves. 201.

If the demandant lawfully refused to accept a conveyance tendered her in pursuance of the terms of the agreement, and repudiated the agreement, there was no need for her to go further and to tender a reconveyance. The instrument being void by her election, if not before, it is hard to see why a release should have been necessary, even if it had purported to convey a legal title. *Somes* v. *Skinner*, 16 Mass. 348, 357. *Somes* v. *Brewer*, 2 Pick. 184, 191. *Chandler* v. *Simmons*, 97 Mass. 508. Still more when the instrument, if valid, would give a mere equitable right to a conveyance, which, strictly speaking, is only a *jus in personam*, (*Western Union Telegraph Co.* v. *Caldwell*, 141 Mass. 489, 492,) and which, if sought to be enforced, would be met by the answer that she had elected against the instrument, and that the trustee no longer held the property in trust for her. But in order to clear the record title, it may be made a condition of dismissing the bill, and of ordering judgment for the demandant, that she file a release of all her rights under the instrument.

*Exceptions overruled, and bill dismissed.*