DANTE STATE BANK *vs.* GIOVANNINA VITTORIOSA CALENDA.

MARCH 25, 1936.

PRESENT: Flynn, C. J., Moss, Baker, and Condon, JJ.

Moss, J. This case was brought for the nonpayment of a promissory note for $2,000 made by the defendant to the plaintiff. The defendant pleaded the general issue and also a plea in set-off that the plaintiff was indebted to her in the principal sum of $12,000, with interest thereon, on four certificates of deposit aggregating that sum. At the conclusion of the trial in the superior court, the jury found a verdict for the plaintiff on its declaration and for the defendant on her plea of set-off, and assessed damages for her in the net sum of $11,300.

No motion for a new trial was filed and the case is now before this court upon the plaintiff's bill of exceptions, based on ninety-four exceptions taken by it at the trial during the introduction of evidence and ten exceptions to charges given by the court to the jury and to the refusal of the court to give charges requested by the plaintiff.

The principal undisputed facts are as follows: The note sued on was dated December 9, 1931, and was payable on demand. The certificates of deposit on which the plea in set-off was based were issued by the plaintiff payable to the order of Giovannina Vittoriosa, the maiden name of the defendant, in the aggregate amount of $12,000. The first two of these, for $2,000 and $3,000 respectively, were issued on August 31, 1928. The third, for $5,000, was issued on April 3, 1930, and the fourth, for $2,000, was issued on January 15, 1931. Another certificate of deposit for

$10,000, payable to her order, was issued by the plaintiff on August 31, 1928. This she personally cashed on December 9, 1931, and at the same time she borrowed from the plaintiff $2,000, for which she gave to it the promissory note on which its action is based.

The two certificates for $3,000 and $5,000 respectively, were paid by the plaintiff to the defendant's husband, Allessandro Calenda, on October 8, 1931, being endorsed by him in her maiden name. The two for $2,000 each were likewise paid by the plaintiff to him on October 20, 1931, being likewise endorsed by him in her maiden name and also in his name. These certificates, thus endorsed, were paid by the plaintiff bank, through its treasurer, Joseph R. Carley, to the defendant's husband in reliance on a power of attorney under seal from her to him, which was on file at the bank and which had been signed by her, and purports to have been acknowledged by her before Ralph Di Luglio, who was then secretary of the bank, on September 20, 1930. It was signed by Ernest Di Luglio, then its vice-president, as a witness. By its terms she appointed her husband her attorney and authorized him "to do any and all matters connected with my account in said Dante State Bank" and "to transact any and all business, and any and all nature of business, as if I were there in person." It also contained at the end the following clause: "I further authorize him to use my funds and to use his own name in handling them."

She testified that she never in any way authorized him to cash any of her certificates or assented to his cashing of them. She, however, admitted that the signature on the power of attorney was hers, but testified that she did not understand what it was and would not have signed it if she had understood. As to whether it was explained to her and as to whether she was misled into signing it, there was conflicting testimony, later on in the case, by her on one side and by these two Di Luglios on the other.

The $8,000 paid, as above stated, by the bank to the defendant's husband on October 8, 1931, was at once used,

at the request of Ralph Di Luglio and with the knowledge of Ernest Di Luglio, in partial payment of a $9,500 note of Domenico Di Luglio, held by the Rhode Island Hospital Trust Company. The rest of the money necessary to pay this note in full was at the same time contributed by one Natale Cellini, and the two of them then received in equal parts 650 shares of the stock of the plaintiff bank which belonged to Domenico Di Luglio and had been held by the Rhode Island Hospital Trust Company as security for the payment of the note. This stock Calenda and Cellini held for some time, until the plaintiff went into liquidation, early in 1932, and as holders of it they exercised some control over the affairs of the plaintiff.

It was somewhat in dispute as to whether the transaction was a sale of the stock by Domenico Di Luglio to Allessandro Calenda and Cellini, as the first named testified he understood, or was a loan by the others secured by the stock. Calenda testified that it was a loan, but he was not clear whether he understood it was to Domenico Di Luglio or to the plaintiff.

The $4,000 paid to Calenda on October 20, 1931, and some money of his own were turned over by him to Ralph Di Luglio, who was a son of Domenico Di Luglio, for some purposes not very clearly shown. Calenda testified that this and some other money furnished by him to Ralph Di Luglio was loaned to pay some notes held by the Mechanics National Bank and the Industrial Trust Company. He was not clear as to his understanding of the transaction. Some parts of his testimony indicated that he thought he was loaning the money to the plaintiff; other parts indicated that he thought he was loaning it to the Di Luglios. At any rate he received as security two deeds to him from Domenico Di Luglio of two pieces of real estate belonging to the latter. Ralph Di Luglio testified that the money was used to pay obligations of his father. There was no evidence that any of the $12,000 went to the plaintiff or to pay any of its obligations, direct or indirect.

The six hundred and fifty shares constituted a large majority of the stock of the plaintiff bank. Domenico Di Luglio had held them for a considerable time, together with one hundred and fifty shares more, and up to October 5, 1931, he had been president and a director of the plaintiff. Thereafter he continued as director, holding the one hundred and fifty shares. Ralph Di Luglio was both secretary and a director of the bank and held ten shares of its stock. Ernest Di Luglio, his brother, was vice-president up to October 5, 1931, when he became president. He held none of the stock.

While the above certificates were outstanding, there were also in the plaintiff bank a savings account standing in the name of the defendant and a checking account standing in her name as "Giovannina Calenda, by Allessandro Calenda, Agent." It was proved that he drew in cash on his own receipt the interest for six months on all the certificates of deposit and deposited it in the latter account. He also drew money on both of the accounts at different times.

In returning their verdict the jury found, on a special issue submitted to them, that the defendant did not know that she was signing a power of attorney to her husband, when she signed the instrument in question.

Whether or not she was bound by this instrument, by the terms of which she appointed him her attorney and gave him very sweeping powers to transact business in her name and stead and to use her funds and to use his own name in doing this, and in reliance upon which the plaintiff bank paid to him the $12,000 on four of the certificates of deposit issued to her, is the most vital and important issue in the case. Therefore the most vital and important of the plaintiff's one hundred and four exceptions is the ninety-seventh, taken to that part of the trial justice's charge to the jury which instructed them as to that very issue. This part of the charge was as follows: "If you find that Mrs. Calenda did not give her husband express authority by conduct or in words or did not ratify, knowing the facts,

what he may have done, if she did know the facts, and if you find that what is claimed to be a power of attorney was signed by Mrs. Calenda in ignorance of the fact that when she signed that paper she was giving her husband the power of control of funds standing in her name, then the bank is liable for whatever funds standing in the name of Mrs. Calenda the bank paid to the husband."

By this language the trial justice virtually told the jury that if this instrument, to which we shall hereafter refer as the power of attorney, was signed by the defendant in ignorance of the fact that by its terms she was giving her husband the power of control over funds standing in her name, it was not binding on her and the jury must disregard it in arriving at their verdict. In their special finding the jury substantially found that it was so signed and that was all that they found therein.

In passing on the question of the correctness of such an instruction in this case, it must be kept in mind that the defendant does not understand the English language, in which the power of attorney was written, although from her testimony it is apparent that she is an intelligent woman. The substantial question of law raised by this exception then is whether a written instrument in English, which has been signed by a person named therein as one of the parties, who was intelligent but did not understand that language, is not binding on that person, if he or she did not understand the nature of the instrument, even though no element of fraud was involved and money has been paid out by another in reliance upon the instrument. This question may arise between such person and the other original party to the instrument or it may arise between such person and a third person in the position of a *bona fide* purchaser.

The general rule as to the right of a party, who has signed a contract, to set up the defense of ignorance of its contents is stated in 6 R. C. L. 624, "Contracts," §43, as follows: "If the contract is plain and unequivocal in its terms he is ordinarily bound thereby. It is the duty of every con-

tracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement." On the next page we read: "The rule that one who signs a contract is presumed to know its contents has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them."

At page 633 of the same volume it is stated that: "The tendency of modern decisions appears to be toward the establishment of a more liberal rule," which is to the effect that a party who has been induced, by the fraud or trickery of the other party, to sign a contract without reading or otherwise ascertaining its contents and who would not have signed it, if he had known its contents, may avoid it as against the other party, even if he himself were guilty of negligence in the matter. The following statement is then made: "Under this view, there can be no question that where an illiterate person, unable to read, signs a written instrument in ignorance of its character or contents, believing it to be an instrument of a different nature, and is induced to do so by the misrepresentations of the other party, whose good faith he has no reasonable ground to suspect, as to the nature or contents of such writing, he is not bound thereby, although he does not request the opposite party or anyone else to read the paper to him before he signs it."

We believe that the farthest that any court has gone, in a well reasoned opinion, in applying this rule liberally is to hold that if a party to a written instrument has signed it because he believed it to be a different kind of an instrument, it cannot be enforced against him by one who knew that it was signed by reason of such mistake, even though he had no part in causing it. *Wright* v. *McPike*, 70 Mo. 175; *Miller* v. *Spokane Int. R. Co.*, 82 Wash. 170; *Palkovitz* v. *American Sheet & Tin Plate Co.*, 266 Pa. 176

After examining a great many authorities on this subject we are inclined to believe that this more liberal rule is correct, but we are convinced that it should not be stretched any further in favor of a party who claims to have signed a legal instrument in ignorance of its character or in the belief that it was of a different character.

In *Blossi* v. *Railway Co.*, 144 Ia. 697, the court held that a release in English, executed by a man who could not understand that language and misunderstood the nature of the paper he signed, could not be avoided by him, when relied on by the defendant in an action brought by him, unless something in the nature of fraud by the defendant was shown. At page 710, the court says: "The most that can be claimed from the testimony offered by plaintiff is that he did not understand the contents or purport of the paper signed by him; but this was due to no fault of the defendant or its agent."

The courts have been particularly liberal with illiterate employees who have signed releases of liability by their employers for injuries suffered by these employees. This liberality is explainable by the fact that the employees thus favored by the courts have been ignorant and subject to some extent to domination by their employers. But even in cases involving releases by illiterate employees, the great majority of the courts before whom the question has come for decision have followed the rule above stated as the correct ones. For a recent example of this see *Union Compress &c. Co.* v. *Shaw*, 187 Ark. 249, 59 S. W. (2d.) 1021, decided in 1933. In that case the plaintiff below, an illiterate, had brought an action to recover for personal injuries sustained by him while in the employ of the defendant, which based its defense mainly on a release signed by him. He admitted signing it, but testified that it was not read or explained to him and he did not understand what it was and had been told before he signed it that the defendant was not liable to him. There was a verdict for him, but the supreme court ordered a new trial because the jury

had been instructed, in substance, that if they found from a preponderance of the evidence that, when he signed the release, he did not know what he was signing, the release was not a good defense to his action.

The most recent case which we have found on this subject is *Barker* v. *Conley*, 267 N. Y. 43, 195 N. E. 677, decided in 1935. There a defense of release had been set up and there was conflicting evidence as to the release having been obtained by misrepresenting the nature of the instrument. As to this the court of appeals, in deciding what question, concerning the release, should have been submitted to the jury, says at page 47 of 267 N. Y., with reference to the question of fraud: "This is the one and only question. No duress was shown and the plaintiff's ignorance of what he was signing is immaterial unless he was deceived in doing so."

There are several Rhode Island cases which are helpful to us in deciding the question now under discussion in the instant case. The first of these is *Diman* v. *Providence, Warren & Bristol R. R. Co.*, 5 R. I. 130, decided in 1858. There this court held, in an opinion by AMES, C. J., that a written subscription by the complainant for stock, accepted in good faith by the respondent corporation, which had acted in reliance upon it and other subscriptions, could not be reformed or rescinded by him on proof of a mistake by him in inadvertently filling it out for twice as many shares as he meant to subscribe for, when he had been obviously negligent in doing so and also in failing to notify the respondent promptly of his mistake, there being, as the court emphasized, "no intermixture of fraud or surprise to put the applicant for relief off his guard."

*Phillips* v. *Potter*, 7 R. I. 289, (1862), was an action of debt, on bond with condition, against a principal and surety. The defense was fraud in the consideration of the bond. The court held that such a defense could be set up at law, in a special plea, where, at least, it is evident that it will work no injustice to the plaintiff. In the opinion, after stating the general rule that a party is estopped to deny

that which he has solemnly affirmed under seal, and stating some exceptions, not pertinent to the case before us, the court at page 295, says: "There is another class of cases, admitted exceptions to the rule above stated, as when the deed is fraudulently read to an illiterate person; when a false deed is substituted for the real one; or, when from the imbecility of age, the weakness of disease, or like causes, the covenantor or obligor is not legally competent to contract. These cases proceed upon the acknowledged principle, that the instrument is *not* the deed of the party executing it; that it is a nullity; and that there is nothing by which he may be estopped." At page 299, this court says: "Admitting that the cases may not all be reconciled, the result of them, we think, is, that when a party to a sealed instrument actually executes it, and is competent to execute it, and is not deceived as to its actual contents, he cannot avoid it upon the plea of *non est factum,* because it is his deed."

The latter language quoted above is quoted with approval in the opinion of this court in *Andrews* v. *Tallman,* 47 R. I. 111, an action on a bond, at page 113, just following a paragraph in which this court says: "The authorities cited by defendant indicate that under the plea of *non est factum* he may be entitled to prove fraud in the execution of the bond whereby the instrument never had a legal existence as in cases of forgery, or where the signature is genuine but the contents of the bond have been misread to an illiterate or where there has been a surreptitious substitution of a different bond from that which the obligor believed he was signing."

It is noteworthy that in neither of the opinions in the two cases just discussed is there any suggestion that in such a case it would be a defense to an action on a sealed instrument that the defendant executed it in ignorance of its contents or under a mistake as to its nature and effect, without proof of fraud or at least misrepresentation.

In *Weil & Co.* v. *Quidnick Mfg. Co.*, 33 R. I. 58, an action to recover for a breach of a written contract not under seal, the defense was fraud, in that the plaintiff's agent, after he and the defendant's agent had made an oral agreement, drew up the very different instrument on which the action was based, and induced the latter to sign it without reading it, by assuring him that it was the same as the oral agreement. There being evidence to support this defense and the jury having found a verdict for the defendant, it was sustained by this court, which says at page 64: "The general rule of law is that a person is bound by an agreement to which he has assented, where his assent is uninfluenced by fraud, violence, undue influence, or the like, and he will not be permitted to say that he did not intend to agree to its terms.

"As a written contract is the highest evidence of the terms of an agreement between the parties to it, it is the duty of every contracting party to learn and know its contents before he signs and delivers it. 9 Cyc. 388.

" 'Of course if the other party induces the signer to sign the paper without reading it, and to rely on his statement of the contents, this may give the signer a right, if the statement was fraudulent, to avoid the contract as against him on the ground of fraud.' 9 Cyc. 390."

The opinion then continues thus: "In *Trambly* v. *Ricard*, 130 Mass. 259, 261, the court said: 'But beyond this (the fact of plaintiff's illiteracy), the evidence offered by the plaintiff, which the jury might have fully believed, tended to show that the written contract was produced by the defendants immediately after an oral contract for the unconditional sale and delivery of the furniture was completed. The jury may well have found that the production of the writing at that time was in itself an affirmation on the part of the defendants that its terms did not differ from the terms of the sale agreed on. Fraud may be proved from the acts and conduct of a party quite as effectively as from his declarations.' . . . 'And any act falsely in-

tended to induce a party to believe in the existence of some other material fact, and having the effect of producing such belief to his injury, is a fraud.'" The agreement was for absolute purchase of furniture and the paper a clingfast. See also *Freedley* v. *French,* 154 Mass. 339; *Peaslee* v. *Peaslee,* 147 Mass. 171, 180; *O'Donnell* v. *Clinton,* 145 Mass. 461; *Smith* v. *Holyoke,* 112 Mass. 517; *Bliss* v. *N. Y. etc. Railroad,* 160 Mass. 447; *Burlington etc. Co.* v. *Evans etc. Co.,* 100 Ia. 469; *Wright* v. *McPike,* 70 Mo. 175; *Girard* v. *St. Louis etc. Co.,* 123 Mo. 358; *Cummings* v. *Ross,* 90 Cal. 68; *Wood* v. *Cincinnati Co.,* 96 Ga. 120.

In *Freedley* v. *French,* 154 Mass. 339, cited in the *Weil & Co.* case, *supra,* the action was brought on a promissory note; and a written release by the plaintiff of the liability of the defendants upon it was relied on by them as their only defense. The plaintiff testified that she signed the release without reading it and because she was told by the defendants' agent that it was only an extension of the time of payment of the note. The questions of fraud and of her negligence were left, for special findings, to the jury, who found in her favor; and a verdict for her was ordered and was sustained by the upper court, which says, at page 342, that it is true that the plaintiff "was required to exercise reasonable care in acquainting herself with the contents of the paper, and that she would not be allowed in an action by or against her on a contract to show simply that she was ignorant of its contents when she signed it, and that it was different from what she supposed it to be, and so to avoid its effect. But this rule would be subject to the condition that no fraud was practiced upon her for the purpose of procuring, and which resulted in procuring, her signature." (citing cases) "And whether she was negligent or exercised reasonable care was a question of fact for the jury, in considering all the circumstances, to decide. It can hardly be said, as matter of law, that a party is guilty of negligence who signs a paper relying upon the representations as to its contents and effect made by the

party presenting it, and without himself examining it. If there may be such cases, this is not one of them."

The next case cited in the *Weil & Co.* case is *Peaslee* v. *Peaslee, supra*. A vital question in that case was the validity of an antenuptial agreement between the demandant in the case and her husband. She testified that, when she signed it, she had no knowledge of its contents except from statements by him; that she began to read it at a lawyer's office, and had read not quite half of it when he, who was walking the floor and looking out of the window, remarked that his horse would not stand, and told her to "hurry up and read it as soon as you can," and that she said to him, "I suppose it is just as you talked," and he said "Yes," and she signed it. In fact it left out a valuable farm. The supreme court, by OLIVER WENDELL HOLMES, J., held that this evidence, "if believed, warranted a finding that the demandant was induced to sign the paper by fraudulent misrepresentation of its contents." This shows the sort of conduct that will warrant a jury in holding void a written agreement signed even by a literate person without reading it.

The next case cited in the *Weil & Co.* case is *O'Donnell* v. *Clinton, supra*. This was a petition for the assessment of damages for the taking of the demandant's real estate by the defendant town; and the defense was a written receipt in full which he had signed by his mark. He testified that, when he put his mark on it, he understood that it was a receipt for only the damages for the taking of the land and did not include the damages for the taking of the house, which was also taken; and that he so stated at the time to the town's commissioners, who said "that would be all right." He was unable to read and they knew it. A finding that the receipt did not bar him from recovering the value of the house was sustained by the supreme court in a very interesting opinion by the same Mr. Justice HOLMES.

At page 462, the court says: "If the petitioner was ignorant of the contents of the instrument prepared by the

respondent, and was known to be so by the respondent's agents, and if he expressly declared in good faith that he set his mark to it as a receipt for the damage to his land alone, and the respondent's agents thereupon accepted the instrument in silence, or with words importing an assent to that declaration, such conduct would be a representation that the instrument was what it was signed for." At page 463, the court says: "We may add, by way of caution, that in the case of a *bona fide* purchaser for value other considerations come in, which have no place here." Further along, on the same page, the court says: "Assent, in the sense of the law, is a matter of overt acts, not of inward unanimity in motives, design, or the interpretation of words."

The other cases which were, as above stated, cited in the *Weil & Co.* case, are all cases of fraud, decided on that ground alone, except *Girard* v. *St. Louis etc. Co., supra,* where the man in question was mentally incapable; and most of them were cases of illiterates. In one of them— *Wright* v. *McPike*—it was held that the jury were correctly instructed that the illiterate plaintiff was not bound by a bond which he had signed, if he signed it without knowing its contents and without any fault or negligence on his part, and would not have signed it if he had known its contents, and the plaintiff had taken it, knowing all these facts.

The citation of cases in the opinion in the *Weil & Co.* case does not lend any support to a contention that this court, in citing them, showed any indication of favoring a rule that a written instrument is not binding on a signer of it simply because he did not understand what it was when he signed it. See also on this point *Weller's Appeal,* 103 Pa. St. 594; *Robinson* v. *Glass,* 94 Ind. 211; *Spitze* v. *Baltimore &c. R. R. Co.,* 75 Md. 162; *Wilson* v. *Pritchett,* 99 Md. 583. These all concern instruments signed by parties who could not read them and were ignorant of their meaning and effect. The principles applicable to this subject are well stated in 5 Wigmore on Evidence, (2d ed.) 268-273, §§2415, 2416.

It appears to be well settled by the authorities, including some above cited, that even when a party to a written instrument has been misled by the fraud of the other party into signing it in the belief that it is something materially different and this belief is shown by clear and convincing evidence, this fact will not prevent a third party in interest, who is in the position of a *bona fide* purchaser for a valuable consideration, from enforcing the instrument, if the first party was not free from negligence in signing it, however it may be if his freedom from negligence is proved.

In applying these principles to the present case it is clear that the above quoted portion of the charge to the jury was erroneous in several particulars, the main one being that in substance it told the jury that in arriving at their verdict they should treat the power of attorney as invalid, if they found that it was signed by the defendant in ignorance of its character, thus leaving out two other elements necessary to enable her to avoid that instrument, namely, that she signed it because of a *mistake* in believing it to be of a different character, and that such mistake was either due to misrepresentation or was fraudulently taken advantage of. It is well settled that mere ignorance is not enough.

Moreover, on this phase of the case, the question is not whether the power of attorney was binding on the defendant, as between her and her husband, but whether it was binding on her as between her and the plaintiff bank, if the bank paid out money in reliance upon it. The plaintiff did act in reliance upon it in paying the $12,000 to her husband and there is no claim that in the meantime she had revoked it. Even if it was not binding on the defendant, as between her and her husband, because of fraud practiced upon her by him, it would be binding on her, as between her and the plaintiff, if the plaintiff did not, through any officer or other representative, acting within the scope of his employment, participate in such fraud or have notice of it or of a misunderstanding by her of the nature and effect of the power of attorney, but, on the

contrary, acted in reliance on it in good faith and she was negligent in signing it as she did. The instruction should have included that element also.

An interesting case on this point is *Roach* v. *Karr*, 18 Kan. 529, (1877). There the defense depended on the invalidity of the execution by an illiterate wife, by her mark, of a mortgage executed by her husband on their homestead. The suit was brought by the mortgagee, whose good faith was established. The wife testified that no one read or explained the instrument to her; that she asked the nature of it before she made her mark and thought it was just a note. Another witness was offered to testify that before the wife made her mark on the mortgage, she asked her husband what it was; that he told her it was none of her business and did not amount to a row of pins, and told her to sign it; and that he further told her that it was only a note. This offered evidence was excluded by the court, and its exclusion was relied on by her in the supreme court as error. The jury found a verdict for the plaintiff and this was affirmed by the supreme court, which says at page 534; "The sound policy of the law forbids that a person thus situated, as Mrs. Roach was, and signing a mortgage under such circumstances as herein presented, should thereafter, as against the mortgagee, innocent of any irregularity in the execution of the instrument, assert that she never consented to the execution thereof. *Helm* v. *Helm*, 11 Kan. 21; *Hallenbeck and wife* v. *DeWitt*, 2 Johns 404. A different rule would open the door to the grossest frauds, and lead to unfortunate results scarcely to be realized."

We are satisfied that the charge to which the plaintiff's ninety-seventh exception was taken was erroneous and that it was seriously detrimental to the plaintiff. Since this exception must be sustained and a new trial ordered, we might properly stop here in this opinion. But the case is an important one and, in some aspects of it, a difficult one. So we deem it proper and advisable to rule

on one of the other exceptions, which raises the other main question of law in the case.

The plaintiff's ninety-eighth exception is to the giving of the following part of the charge to the jury: "If you find that Mrs. Calenda did give a valid power of attorney and you also find that the bank, through its officers and directors, had knowledge of and recognized and approved or took part in the endorsement of any certificates of deposit standing in the name of Mrs. Calenda, to serve directly or indirectly any purpose of the bank itself and you further find that Mrs. Calenda knew nothing about such transaction, then the Dante State Bank is, again, liable because a power of attorney given by a depositor for her own purpose cannot be turned into a shell of protection by a bank, which, through its directors, has knowingly participated in the diversion of funds for its own immediate or ultimate benefit and advantage."

The first part of this, as far as the word "because," virtually told the jury that even in case the power of attorney was valid and the bank acted in reliance on it in paying the $12,000 to her husband, yet, if she was ignorant of the payment, the bank still owes her the money, provided that through its officers and directors it made the payment to serve directly or indirectly any purpose of its own. This instruction was, in our judgment, too indefinite and general, and left entirely too much freedom to the jury in finding a verdict for the defendant on her plea in set-off. One of the premises, on which the conclusion stated was based, was that the power of attorney was valid. In this, as above stated, after vesting very broad powers in her husband, she ended as follows: "I further authorize him to use my funds and to use his own name in so handling them." Whether or not this authorized him to convert her funds absolutely and permanently to his own benefit, it is clear that if it was valid, as assumed in this part of the charge, it authorized him to invest them as if they were his own, and to make at least such temporary use of them for his own purposes as he deemed proper. No one paying money to him, in

reliance upon the power of attorney and in good faith, was under any duty to her to see that she got the money or that she got any benefit from it.

It may be that there were some limits to what the bank could legally do in reliance upon the extremely broad powers which he had under that instrument. It may well be that it could not induce him to make a present to the bank of the money represented by the certificates or of any part of it, or to invest any of it in securities owned by the bank which it knew to be worthless or of less value than he paid for them, without being accountable to her for the benefit which the bank derived from the transaction. But that is a very different thing from saying that if the power of attorney was valid and the bank, without her knowledge, "recognized and approved or took part in the endorsement of any certificates of deposit standing in the name of Mrs. Calenda, to serve directly or indirectly any purpose of the bank itself," then the bank is liable, from which the jury would naturally understand that the bank would then remain liable to her for the full amount of the certificates so endorsed.

The reason given, at the end of this part of the charge, for holding the bank thus liable to her, under the circumstances stated, did not remove the objection, especially as it described the power of attorney as given by her for her own purpose, when, by the final clause of that instrument her husband was authorized to use her funds and handle them in his own name. If he chose to make a certain disposition of the proceeds of the certificates and the bank had no notice that this was outside of his powers under the power of attorney, we cannot see that the bank would be liable to her for such proceeds simply because some proper purpose of the bank would also be indirectly served by such disposition of such proceeds. In this connection the jury's attention should at least have been called to that clause.

Moreover, this part of the charge after the word "because" virtually told the jury that such a power of attorney is no

protection to "a bank; which through its directors, has knowingly participated in the diversion of funds for its immediate or ultimate benefit and advantage." This was in our opinion erroneous for several reasons. In the first place there was no evidence that the bank's *directors*, acting as such, had anything to do with the payment of the certificates or the use of the money paid. In the second place, the jury may have understood from this language that the court was telling them that the plaintiff bank *had* knowingly participated in the diversion of funds for its own benefit and advantage, which certainly, to say the least, was not conclusively proved by the evidence. In the third place, if it did not convey that meaning to the jury, it at least left it to them to find, from the evidence, that the bank had thus participated in a diversion of funds for its own benefit and advantage, without any instruction from the court how to determine whether the use made of the proceeds of the certificates constituted a "diversion" of them, in view of the broad language at the end of the power of attorney, or how to determine whether the acts of the two younger Di Luglios, the only officers of the bank who participated in such use of these proceeds, constituted participation by the bank, or how they could find that the drawing of $12,000 by Calenda from the bank, when its affairs were in a shaky condition, and the use of the money to pay notes of the senior Di Luglio were "for its benefit and advantage."

We find that the giving of that part of the charge to the jury to which the plaintiff's ninety-eighth exception applied was erroneous.

The plaintiff's exceptions ninety-seven and ninety-eight are sustained. Its other exceptions are neither sustained nor overruled. The case is remitted to the superior court for a new trial.

*Huddy & Moulton, Stuart H. Tucker*, for plaintiff.

*Dooley, Jackvony, Curran & Dunn, Louis V. Jackvony*, for defendant.